[No. A123907. First Dist., Div. Four. Feb. 15, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
PHONG BUI, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.A. and B.

**COUNSEL**

Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Matthew Zwerling, J. Bradley O'Connell and Richard Such for First District Appellate Project as Amicus Curiae on behalf of Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Gerald A. Engler, Assistant Attorneys General, René A. Chacón and Donna M. Provenzano, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

RIVERA, J.—Defendant Phong Bui appeals a judgment entered upon a jury verdict finding him guilty of attempted murder (Pen. Code,[1] §§ 187, 664, subd. (a)), mayhem (§ 203), first degree residential robbery (§§ 211, 212.5, subd. (a)), and first degree residential burglary (§§ 459, 460, subd. (a)). He contends on appeal that his conviction of attempted murder is not supported by substantial evidence, that the trial court committed instructional and sentencing error, and that he received ineffective assistance of counsel. We agree that the trial court committed sentencing error, and shall remand for resentencing. In all other respects, we shall affirm.

## I. BACKGROUND

### A. *The Robbery*

Billy Huynh and his wife Tammy Le lived in Bay Point with their son, William, and with Le's children, Thu and Mike Le.[2] At the time of the events in question, Mike was 17 years old, Thu 14, and William was a baby. Le kept large amounts of cash in a safe in the closet of her bedroom. Mike knew the safe contained cash.

At approximately 11:45 p.m. on November 13, 2005, while Le was in bed, two men came into her bedroom. Her baby, William, was also in the room. Le called for Huynh, who emerged from the bathroom, and the two men made them both lie down. The older of the two men had a knife, and the other, who was wearing a mask and appeared to be about Mike's age, was holding a gun.[3] At trial, Le identified the man with the gun as defendant, saying she recognized him by his eyes.

Defendant took the home phone and cell phone, and asked where the safe was. Le said that the key to the safe was downstairs, and defendant brought Huynh downstairs. Before doing so, defendant went into other rooms. He pointed a gun at Thu, who was in her bedroom, told her to give him her phone, took the phone, and left the room. Thu then went into Le's bedroom.

---

[1] All undesignated statutory references are to the Penal Code.

[2] Because Mike and Thu Le share their mother's last name, we will refer to them by their first names. Mike's birth name was Vu Le, but he went by the name Mike.

[3] Defendant was 17 years old at the time.

On the way, she noticed that Mike's bedroom window was wide open.[4] She also noticed that the gunman was wearing shoes identical to some Mike used to have.[5] Thu heard Huynh ask where Mike was, and the gunman "said something about if you see that window open, then you know with [*sic*] your son's at." Both men told Huynh that Mike was "okay."

Huynh hoped defendant would be satisfied with $200, which was kept under the kitchen sink. In the kitchen, however, defendant pointed the gun at Huynh, and Huynh tried to push the hand holding the gun away. The gun went off, and Huynh fell to the floor, face down, unable to move. As he lay on the floor, he heard at least two more shots. The time between the first shot and the later shots was "Very quick. Less than 10 [seconds]," and the second and third shots occurred in rapid succession.

The man with the knife kept Le, Thu, and William in Le's bedroom. Le heard four gunshots from downstairs. Thu testified to hearing two or three shots. The man with the knife ran out of Le's bedroom, saying "[W]hat the hell are you doing[?]," or "Why the hell did you shoot him?" Le ran downstairs and saw Huynh lying on the kitchen floor, "all bloody." Defendant and the other man ran away.

After police officers arrived, Huynh began to feel excruciating pain in his abdomen, and he passed out on the way to the hospital. He had four surgeries to treat his injuries, including surgery on the gunshot wounds to his arm and abdomen, and surgery to remove clots from his left leg.

Doctors who treated Huynh found a bullet entry wound in the elbow, and no exit wound. Among Huynh's injuries, the tip of his elbow was "in multiple pieces," "fractured to the point where it was just like grains of sand," and his distal humerus bone was fractured. Huynh suffered abdominal bleeding, resulting from an arterial injury.

Bullets were retrieved from Huynh's elbow and the small of his back. Huynh later saw a small round hole in his kitchen window.

---

[4] As Thu was going to bed about 11:00 p.m., she had noticed that Mike was not in his bedroom and the bedroom window was slightly open. He had been in his bedroom sometime between 10:00 and 10:45 p.m., when Huynh said goodnight to him.

[5] Mike testified that he had given the shoes to defendant. Shoes of the same type were found in defendant's bedroom, and he confirmed that Mike had given them to him.

B. *Defendant's Statements to Detective*

In an interview with a sheriff's detective, defendant admitted taking part in the robbery. He said Mike had told him and another man, Abe, that there was money in a safe in Mike's parents' room and that Mike planned the robbery. He said the pair had rung the doorbell without result. He entered the house through Mike's window, then opened the door for Abe. Abe then "took over." Defendant was downstairs, and went up only when Abe called to him to collect the cell phones. Abe checked the rooms, and defendant saw that Mike's sister was bald.[6] He heard gunshots. He said the robbery had "links" to an earlier marijuana robbery he had been involved in, because Mike owed money as a result of that incident.[7]

C. *Evidence of Prior Incident*

Amy Le[8] testified that on October 5, 2005, someone approached her and a friend named David Li, pulled a gun, and told Li, "Drop down and give me your wallet." Amy Le identified defendant as the gunman in a photographic lineup.

Fragments of a bank card or credit card taken during that robbery were found in the side yard of Huynh and Le's home after Huynh was shot. Mike testified that he and defendant had stolen the card from someone in Oakland and used it, and that he had cut up the card and thrown it out the window.

D. *Mike's Testimony*

Mike testified that he knew defendant.[9] Shortly before the incident at issue in this appeal, his mother found him putting marijuana into bags. He and defendant had stolen the marijuana from a house in Oakland, and he intended to sell it. Another friend, Abe, had told defendant and Mike the marijuana

---

[6] Thu had a medical condition that caused hair loss.

[7] The marijuana robbery will be discussed in part I.D., *post*.

[8] Amy Le does not appear to be any relation of Tammy Le. To avoid confusion, we will refer to her by both her first and last name.

[9] At the time of trial, Mike was serving a six-year prison term for assault with a deadly weapon based on an incident that took place in July 2006. In a juvenile matter, he had also admitted to committing grand theft, based on a May 2006 incident that took place when he was on probation for a separate juvenile matter. The prosecutor in the present action had told him she did not have enough evidence to prosecute him, and promised him that if he testified truthfully, he would not be prosecuted.

would be there. There were two people in the house from which they stole the marijuana. During the robbery, Mike was armed with a Taser, and defendant was armed with a loaded gun. They agreed to split the marijuana, with half going to the person who had told Abe about the marijuana, and the rest divided among Mike, Abe, and defendant. Abe, however, accused Mike of taking more than his share, and took the position that Mike owed him between $40,000 and $50,000. Defendant told Mike that Abe would "get [him] back for what [he] did."

Mike knew that his parents kept large amounts of money in a safe, and told defendant the combination to the safe. He and defendant agreed that defendant would steal the money, and after Abe was repaid, they would split the rest of the money. They planned for Mike to sneak out through his bedroom window and leave it open for defendant. Defendant later told Mike he had left the house with no money, but did not mention shooting Huynh.

Mike also testified that he and defendant had stolen bank cards on about five to 10 occasions in the past and used them to buy gasoline.

E. *Defendant's Testimony*

Defendant testified in his own defense. He admitted being involved in the Oakland home invasion robbery in which he and Mike stole marijuana, and said that there were hard feelings afterward between Mike and Abe over the distribution of the marijuana. He knew before going to the Oakland house that it was occupied, and he brought a Taser with him.

Defendant testified that he did not remember stealing Li's wallet and that he was not with Mike when he used Li's bank card.

Defendant denied that Mike had suggested robbing his parents, but said Mike had bragged about having a safe and large sums of money in his house. Mike had told them that the safe would be in the bedroom, but had not given them the combination to the safe.

Defendant testified that Abe told him to lure Mike out of the house on the night in question. He denied having been present during the invasion of

Huynh and Le's home. He said he heard about it afterward from Abe, Mike, and another person, Little John. He acknowledged that he had told a detective that he was involved in the invasion, but said he did so in the hope of being allowed to go home.

Defendant testified that in March 2005, he had admitted in a juvenile proceeding to committing robbery. (§ 211.) When asked what the petition involved, he replied "Me and [another person] taking candy from kids on Halloween with lead pipes."[10]

F. *The Verdicts and Sentencing*

On count one, the jury found defendant guilty of attempted murder (§§ 187, subd. (a), 664, subd. (a)), but found not true an allegation that the attempted murder was willful, deliberate, and premeditated, and found defendant had personally used and discharged a firearm, causing great bodily injury (§ 12022.53, subds. (b), (c) & (d)). On count two, the jury found defendant guilty of mayhem (§ 203), and found true three firearm enhancements (§ 12022.53, subds. (b), (c) & (d)). On count three, the jury found defendant guilty of first degree residential robbery (§§ 211, 212.5, subd. (a)) of Huynh, with firearm enhancements (§ 12022.53, subds. (b), (c) & (d)). On counts four and five, defendant was found guilty of first degree residential robbery (§§ 211, 212.5, subd. (a)) of Le and Thu respectively, with enhancements for personal use of a firearm (§ 12022.53, subd. (b)). On count six, the jury found him guilty of first degree residential burglary (§§ 459, 460, subd. (a)), with an enhancement for personal use of a firearm (§ 12022.5, subd. (a)). The trial court found true a strike allegation. (§ 1170.12.)

The trial court sentenced defendant to the midterm of seven years for count one, attempted murder. For count two, mayhem, it imposed a consecutive term of one year four months. For count three, residential robbery of Huynh, it sentenced him to a consecutive term of one year four months. The court also imposed a separate consecutive enhancement of 25 years to life pursuant to section 12022.53, subdivision (d), in connection with each of these three counts. The court sentenced defendant to serve sentences of four years for counts four and five, residential robbery of Le and Thu, to run concurrently with count three, and for each of these counts imposed a consecutive enhancement of three years four months pursuant to section 12022.53,

---

[10] On cross-examination, he testified that he was 16 years old at the time of the Halloween offense, and agreed that a victim's statement that he got out of a car with a lead pipe, raised it in the air as if to swing it, and said, "Do you wanna make this easy?" sounded "fair."

subdivision (b). The court imposed and stayed sentence on count six, burglary, pursuant to section 654. Thus, the total determinate term was 16 years four months, and the total indeterminate term for the three section 12022.53, subdivision (d) enhancements was 75 years to life.

## II. DISCUSSION

A., B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Election and Unanimity Instruction*

Defendant contends the trial court erred in failing to require the prosecution to elect which shot it relied on for the attempted murder charge and by failing to give a unanimity instruction.[12]

In her closing argument, the prosecutor argued that whether or not the first shot defendant fired was an accident, the remaining shots were fired when Huynh was lying on his stomach, unable to move, and posing no threat, and that because there was no other purpose to the remaining shots, the jury should conclude he committed attempted murder. Defendant contends that in light of the testimony of the eyewitnesses and the prosecutor's argument, defense counsel should have moved to require the prosecutor to elect which acts the People were relying on to prove attempted murder, that his counsel rendered ineffective assistance by failing to do so, and that the trial court should have given the unanimity instruction.

"In a criminal case, a jury verdict must be unanimous. [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime. [Citation.] Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]" (*People v. Russo* (2001) 25 Cal.4th 1124, 1132 [108 Cal.Rptr.2d 436, 25 P.3d 641].) However, "[t]he unanimity instruction is not required when the acts are so closely connected in time as to form part of one transaction. [Citations.] This branch of the 'continuous conduct' exception [citation] applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between

---

*See footnote, *ante*, page 1002.

[12] CALCRIM No. 3500 provides in part: "The People have presented evidence of more than one act to prove that the defendant committed this offense. You must not find the defendant guilty unless you all agree that the People have proved that the defendant committed at least one of these acts and you all agree on which act (he/she) committed."

them. [Citations.]" (*People v. Crandell* (1988) 46 Cal.3d 833, 875 [251 Cal.Rptr. 227, 760 P.2d 423]; see also *People v. Maury* (2003) 30 Cal.4th 342, 423 [133 Cal.Rptr.2d 561, 68 P.3d 1].) This exception " 'is meant to apply not to all crimes occurring during a single transaction but only to those "where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto." [Citation.]' [Citation.]" (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 299 [34 Cal.Rptr.2d 483].)

The evidence showed that all of the gunshots were part of one continuous course of conduct. Huynh suffered two gunshot wounds, and a shot appeared to have made a hole in the home's window. Huynh testified the three shots he heard were fired within seconds of each other. There was no evidence from which the jury could conclude defendant fired one shot but not the other. (See *People v. Riel* (2000) 22 Cal.4th 1153, 1199 [96 Cal.Rptr.2d 1, 998 P.2d 969].) On this record, the shots formed one transaction, and the jury must either have accepted or rejected Huynh's testimony in toto. In the circumstances, the prosecutor was not required to elect which among the shots she relied on for the attempted murder charge, and the trial court was not required to give the jury a unanimity instruction.

D. *Consecutive Sentencing*

   1. *Consecutive Terms for Counts One, Two, and Three*

Defendant argues the trial court labored under a misunderstanding of the law when it ordered the sentences and enhancements for counts two and three to run consecutively to those for count one.[13] According to defendant, the trial court mistakenly believed these sentences, and their enhancements under section 12022.53, subdivision (d), had to run consecutively, despite section 654's prohibition on multiple punishment.[14] Defendant asks us either to order the sentences on counts two and three stayed pursuant to section 654 or to remand the matter to the trial court to exercise its discretion to decide whether the sentences should run concurrently or consecutively.

█ Section 12022.53 provides for additional punishment for use or discharge of a firearm during certain felonies, including mayhem (*id.,*

---

[13] This issue was initially raised in an amicus curiae brief submitted by the First District Appellate Project (FDAP). Defendant has joined in FDAP's arguments, and we shall treat them as defendant's arguments. At our invitation, the Attorney General filed a brief in opposition to the amicus curiae brief, and defendant submitted a reply.

[14] Section 654, subdivision (a), provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

subd. (a)(2)), robbery (*id.*, subd. (a)(4)), and attempted murder (*id.*, subd. (a)(1), (18)). As pertinent here, section 12022.53, subdivision (d) provides: "Notwithstanding any other provision of law, any person who, in the commission of a felony specified in subdivision (a), . . . personally and intentionally discharges a firearm and proximately causes great bodily injury . . . or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment in the state prison for 25 years to life."

Our Supreme Court interpreted this provision in *People v. Palacios* (2007) 41 Cal.4th 720 [62 Cal.Rptr.3d 145, 161 P.3d 519] (*Palacios*). The defendant there had fired a single shot at a single victim during the simultaneous commission of three qualifying offenses. (*Id.* at p. 723.) As relevant here, the defendant was convicted of attempted murder, kidnapping for carjacking, and kidnapping for robbery. He was sentenced to three consecutive terms of life imprisonment with the possibility of parole for these crimes, and the trial court added a section 12022.53, subdivision (d) enhancement of 25 years to life for each of these convictions. (*Palacios*, at p. 724.) He contended on appeal that the imposition of multiple section 12022.53 enhancements violated section 654, and the Court of Appeal agreed, concluding that even though section 654 did not preclude separate punishment for each of the underlying offenses, the defendant should receive only one enhancement because there was only one victim and a single act of discharging a firearm. (*Palacios*, at pp. 723, 725.) The Supreme Court reversed, holding that "the sentence enhancement provisions of Penal Code section 12022.53 are not limited by the multiple punishment prohibition of Penal Code section 654," and ordered the 25-year-to-life terms reinstated. (*Id.* at pp. 723, 734.) In *Palacios*, then, the issue the court considered was whether section 654 prohibited multiple sentence enhancements under section 12022.53 *when it did not prohibit multiple punishment of the underlying crimes.*

At the sentencing hearing here, the trial court and counsel discussed the effect of *Palacios*. After being invited to give her views on the appropriate sentence, the prosecutor said, "[I]t's the People's position based on *Pal[ac]ios* the 25 [to] life for Count One, Two, Three is mandatory consecutive. [¶] So based on my understanding of the case law, the Court does not have discretion on the 75 to life indetermina[te] sentence as [to] Count One, Two, Three for the [section 12022.53, subdivision (d)], and because of that 75 to life consecutive sentence the People do feel that striking the prior conviction is appropriate in this case." After further discussion of sentencing on the various counts, defense counsel stated, "And . . . with respect to the *Pal[ac]ios*, it is unmistakably clear that the California Supreme Court is clear that it's mandatory; therefore, I . . . submit on that issue."

The court went on: "I . . . would like to hear from counsel with regard to Count Two being, basically, the same occasion and same set of operative facts." The prosecutor replied, "That is governed by the *Pal[ac]ios* case cited in the People's brief. [¶] It's not 654 precluded. It's in *Pal[ac]ios*, it's a single victim as the Court will recall, there was a single victim who was kidnapped car jacked . . . . [¶] The facts are very, very similar to this. There was one got [*sic*] shot. One wound. And neither the substantive counts nor the .53 enhancements was found to be 654." Defense counsel then stated, "Counsel faithfully recites the opinion in this case and their reasoning. [¶] I make objection for in the event [*sic*] that some later time it becomes overturned, but it appears that the rationale is for each crime the mandatory 25 to life needs to be imposed. It's unequivocal language."

The trial court then ruled: "Given the nature of the enhancements [and] so forth, that the Court has no discretion in imposing or not imposing, the Court will find in the interest of justice pursuant to 1385 to strike the strike allegation that was found true, May 12, '05, 211 . . . ." As relevant here, the court then imposed the midterm of seven years for count one, with a consecutive 25-year-to-life enhancement under section 12022.53, subdivision (d). On counts two and three, it imposed consecutive sentences of one-third the midterm, and for each of those counts imposed a consecutive enhancement of 25 years to life under section 12022.53, subdivision (d).

Defendant contends both the trial court and counsel misunderstood the reach of the *Palacios* decision—that is, that they mistakenly believed *Palacios* required the court to impose consecutive enhancements under section 12022.53, subdivision (d) on counts one, two, and three, whether or not section 654 might otherwise prohibit multiple punishment for the underlying offenses.[15] The Attorney General does not appear to contend that *Palacios* requires consecutive enhancements in these circumstances, but instead contends the record does not show the trial court misunderstood the scope of its discretion.

In our view, defendant has the better argument. The colloquy between the trial court and counsel persuades us the court believed *Palacios* required

---

[15] This question of whether the trial court acted in excess of its jurisdiction by failing to stay execution of a sentence under section 654 is not waived by failure to raise it below. (See *People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17 [36 Cal.Rptr.2d 627, 885 P.2d 1040]; see also *People v. Dotson* (1997) 16 Cal.4th 547, 554, fn. 6 [66 Cal.Rptr.2d 423, 941 P.2d 56] [claim that sentence is unauthorized may be raised for first time on appeal].) In any case, we would exercise our discretion to consider defendant's contentions that, based in part on the actions of defense counsel, the trial court was misled about the scope of its discretion. (See *People v. Mattson* (1990) 50 Cal.3d 826, 854 [268 Cal.Rptr. 802, 789 P.2d 983] [considering merits of contention not raised in trial court in order to forestall claim of constitutionally inadequate representation].)

consecutive sentences on the underlying crimes. This is made particularly clear by the court's request that counsel address the question of the mayhem count "being, basically, the same occasion and same set of operative facts." This can only be interpreted as a request for the parties to discuss whether punishing defendant for both mayhem and attempted murder would violate section 654's prohibition on double punishment. The prosecutor cited *Palacios* to argue that section 654 did not preclude double punishment, defense counsel agreed that the prosecutor "faithfully recite[d]" the *Palacios* opinion, and the court indicated that it had "no discretion in imposing or not imposing" the enhancements. Thus, it appears that the trial court believed it had no authority to stay the sentence, and the accompanying enhancement, for the mayhem count. It is logical to conclude the court believed the same as to the count three robbery.

This interpretation, however, misreads *Palacios*. The question before our high court in *Palacios* was not whether section 654 prohibits multiple sentences; the question was whether section 654 prohibits multiple *enhancements* under section 12022.53 where section 654 did not prohibit multiple punishment for the underlying offenses. (*Palacios, supra,* 41 Cal.4th at p. 723.)[16] *Palacios* thus does not support the trial court's conclusion. Rather, as made clear in *People v. Oates* (2004) 32 Cal.4th 1048, 1066 [12 Cal.Rptr.3d 325, 88 P.3d 56], "[t]he subdivision (d) enhancements [of section 12022.53] 'simply follow from' [the defendant's] convictions on those 'substantive offenses.' [Citation.] They 'do not constitute separate crimes or offenses, but simply are the basis for the imposition of additional punishment for the underlying substantive offense. [Citation.]' [Citations.]" (See also *People v. Mustafaa* (1994) 22 Cal.App.4th 1305, 1310 [28 Cal.Rptr.2d 172] (*Mustafaa*) ["[t]he procedure for sentencing a person convicted of two or more felonies does not contemplate imposing an enhancement separately from the underlying crime"].) Both the prosecutor and defense counsel thus erroneously informed the court that *Palacios* prohibited the court from exercising its authority under section 654 to stay the punishment for the underlying crimes and their enhancements.

Defendant contends the trial court was *obliged* to stay the sentences on counts two and three pursuant to section 654. As a backup argument, he contends that if we conclude the sentences were not required to be stayed, we should remand the matter to the trial court to exercise its discretion to decide whether to impose consecutive or concurrent terms.

---

[16] Or, to quote from the decision itself, "[t]he question is whether section 654 precludes punishment for more than one section 12022.53 enhancement when each is based on a single act committed against a single victim, although in the commission of separate crimes." (*Palacios, supra,* 41 Cal.4th at p. 726.)

■ "Penal Code section 654 prohibits punishment for two crimes arising from a single indivisible course of conduct. [Citation.] If all of the crimes were merely incidental to, or were the means of accomplishing or facilitating one objective, a defendant may be punished only once. [Citation.] If, however, a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.] The defendant's intent and objective are factual questions for the trial court, and we will uphold its ruling on these matters if it is supported by substantial evidence. [Citation.]" (*People v. Perry* (2007) 154 Cal.App.4th 1521, 1525 [65 Cal.Rptr.3d 654] (*Perry*); see also *People v. Bowman* (1989) 210 Cal.App.3d 443, 448 [258 Cal.Rptr. 358].)

■ We agree with defendant that under section 654, he may not be punished for both the attempted murder and mayhem counts. At the sentencing hearing, the trial court indicated that the two crimes were "the same occasion and same set of operative facts." The offenses were both based on the shooting of Huynh. As we have already concluded—and as the Attorney General argued in opposing defendant's contention that a unanimity instruction was required—the three shots were fired within seconds of each other, and formed one transaction.[17] There was no evidence defendant had independent objectives for the two crimes that would justify multiple punishment. In the circumstances, the sentence for the mayhem count should have been stayed. (See *People v. Pitts* (1990) 223 Cal.App.3d 1547, 1560 [273 Cal.Rptr. 389] [where convictions of mayhem and assault were based on one attack on one victim, sentence for lesser offense must be stayed under § 654].)

■ As to the count of robbery of Huynh, the trial court made no finding, implied or express, that the robbery and attempted murder of Huynh arose from an indivisible course of conduct with a single objective. It has been held that "where a burglary or a murder is committed to facilitate a robbery, section 654 prevents multiple separate terms under separate statutes for each such 'indivisible' offense." (*People v. Melton* (1988) 44 Cal.3d 713, 767 [244 Cal.Rptr. 867, 750 P.2d 741]; see also *People v. Lowe* (1975) 45 Cal.App.3d 792, 795 [119 Cal.Rptr. 699] [robbery and murder or attempted murder].)

---

[17] The Attorney General's original opposition brief (filed before FDAP submitted its amicus curiae brief raising the sentencing issues relating to *Palacios* and § 654) argues in connection with the requirement of a unanimity instruction: "[T]he evidence in this case shows only one criminal act of attempted murder, even though appellant fired several shots at Billy Huynh. The gunshots were so closely connected as to form a single transaction and, thus, constitute a continuous course of conduct. [¶] . . . [T]he gunshots occurred in rapid succession. These acts are most appropriately viewed as one continuous attempt at murder during a brief and uninterrupted period of time."

However, an act of "gratuitous violence against a helpless and unresisting victim . . . has traditionally been viewed as not 'incidental' to robbery for purposes of Penal Code section 654." (*People v. Nguyen* (1988) 204 Cal.App.3d 181, 190 [251 Cal.Rptr. 40]; see also *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271–272 [104 Cal.Rptr.2d 641] [sufficient evidence that defendant harbored divisible intents in committing robbery and attempted murder when he repeatedly hit feeble, unresisting victim with two-by-four, using far more force than necessary to achieve one objective].) Here, the evidence showed that defendant continued to shoot Huynh after he fell to the floor, face down, unable to move. In the circumstances, defendant's intent and objectives are factual questions for the trial court. (*Perry, supra*, 154 Cal.App.4th at p. 1525.) We therefore remand the matter to the trial court to determine whether the shooting was incidental to the robbery for purposes of section 654 and, if not, whether to impose a consecutive or concurrent sentence for count three. (See *People v. Jones* (2007) 157 Cal.App.4th 1373, 1383 [69 Cal.Rptr.3d 262] [remand for resentencing appropriate where court was mistaken as to scope of discretionary powers]; *People v. Jackson* (2005) 134 Cal.App.4th 929, 936 [36 Cal.Rptr.3d 477] [sentencing decision made by court that is mistaken regarding its discretion generally results in remand for proper exercise of discretion].)

Because we are remanding for resentencing, we need not consider defendant's contentions that his counsel rendered ineffective assistance in connection with the sentencing hearing.

### 2. *Terms for Enhancements on Counts Four and Five*

█ The trial court ordered the sentences for counts four and five to run *concurrently* with that for count three, but imposed *consecutive* enhancement terms (one-third of 10 years) under section 12022.53, subdivision (b), in connection with those offenses. Defendant contends it was error to impose consecutive enhancement terms when the sentences on the underlying offenses were ordered to run concurrently with other sentences. The Attorney General properly concedes this point. As explained in *Mustafaa*, "an enhancement may not be imposed as a subordinate term on its own" (*Mustafaa, supra*, 22 Cal.App.4th at p. 1310), and a trial court violates this rule by "imposing a concurrent term for the felony conviction and a consecutive term for the enhancement . . ." (*id.* at p. 1311).[18]

---

[18] Defendant also points out three clerical errors in the abstract of judgment, which the Attorney General has conceded must be corrected to reflect the judgment of the trial court. Because we are remanding for resentencing in full, we need not address these errors here.

### III. DISPOSITION

The matter is remanded for resentencing in accordance with the views expressed in this opinion. In all other respects, the judgment is affirmed.

Ruvolo, P. J., and Sepulveda, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 18, 2011, S191488.