Filed 3/25/26  P. v. Lugo CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>RAFAEL SANTIAGO LUGO,<br><br>        Defendant and Appellant. | F088895<br><br>(Super. Ct. No. MCR075082)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Madera County.  Dale J. Blea, Judge.

Joshua L. Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Darren K. Indermill and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant Rafael Santiago Lugo was convicted by a jury of one count of committing a lewd act on a minor aged 14 or 15 years old in violation of Penal Code section 288, subdivision (c)(1)[1] (section 288(c)(1)). The trial court sentenced defendant to three years' imprisonment. Lugo raises a single issue on appeal: whether the trial court prejudicially erred by failing to give the jury a unanimity instruction. We affirm.

## PROCEDURAL BACKGROUND

On July 3, 2023, the Madera County District Attorney filed an information that charged Lugo with one count of sexual penetration of a person under the age of 16 (§ 289, subd. (i); count 1) and four counts of lewd conduct on a child aged 14 or 15 (§ 288(c)(1); counts 2, 3, 4, & 5). All counts were alleged to have occurred on or about September 18, 2021, and all counts were alleged to have been committed against victim Mia. Count 2 alleged the lewd conduct was the touching of Mia's vagina; count 3 alleged the lewd conduct was the touching of Mia's breasts; count 4 alleged the lewd conduct was the touching of Mia's buttocks; and count 5 alleged the lewd conduct was Lugo placing Mia's hands on his penis. The information included three aggravating circumstances under California Rules of Court, rules 4.421(a)(3) (victim was particularly vulnerable), (a)(8) (crime reflects planning and sophistication), and (a)(11) (defendant took advantage of a position of trust).

On November 14, 2023, a jury was unable to arrive at a verdict on any of the five counts, and the trial court declared a mistrial.

On February 7, 2024, an amended information was filed that charged Lugo with a single count of a lewd act on a child aged 14 or 15 (Mia) in violation of section 288(c)(1) for conduct occurring on or about September 18, 2021. The same three aggravating circumstances from the July 2023 information were re-alleged in the amended information. However, unlike the July 2023 information, the amended information did not identify any specific acts by Lugo that would constitute a lewd act.

---

[1] All further statutory references are to the Penal Code.

A jury trial began on February 14, 2024, and concluded on February 22, 2024. The jury found defendant guilty on the single count alleged against him.

On November 4, 2024, in a bifurcated proceeding, the trial court found the three aggravating circumstances true. The same day, the court sentenced Lugo to the upper term of three years.

On November 5, 2024, Lugo appealed.

## FACTUAL BACKGROUND

Lugo was born in 1986 and is married to Angel S. Lugo and Angel have three biological children together. Lugo is the stepfather to two of Angel's children, including Savannah who was born in 2007. Mia was born in 2007 and is Lugo's niece by marriage. Mia's mother is Rindy B., and Angel is Rindy's sister. Tony S. is Angel and Rindy's brother and Mia's uncle.

On September 18, 2021, Lugo and Angel had a birthday party at their home for one of their daughters. Mia and other family members attended the party. Mia stayed the night because she wanted to stay with her cousin Savannah. Mia and Savannah slept in Savannah's room. To get to Savannah's room, one has to first go past Savannah's older brother's room and then go through her two younger sisters' room.

During the night, Mia woke Savannah and told her that Lugo had either raped her or touched her inappropriately. Savannah and Mia eventually both fell back asleep. Mia and Savannah did not talk further about what had happened with Lugo during the night. The next day, after playing with her cousins in the morning, Mia returned to her home.

Approximately two months after the birthday party, Mia spoke to her mother's fiancé. In essence, Mia disclosed to the fiancé that Lugo had molested her the night of the birthday party. The fiancé told Rindy what Mia had said. Rindy tried to talk to Mia about what had happened, but Mia cried and was upset. It appears that Mia did not tell Rindy very much, if anything, and Rindy did not contact the police. However, Mia disclosed the molestation to law enforcement during the course of an unrelated incident.

3.

The police investigated the matter, and the district attorney brought criminal charges against Lugo for his conduct towards Mia.

*Mia's Testimony*

At trial, Mia testified in part that she recalled going to her cousin's home for a birthday party on September 18, 2021. Mia stayed the night because she wanted to spend time with Savannah, with whom she was really close. The night of the party, Mia slept in Savannah's room. Mia woke up during the night because she felt someone poking her in the back. After Mia felt the poking, she heard footsteps coming into Savannah's room from her other cousins' room. Mia saw Lugo in the doorway, and Lugo told her that she had to go to the living room because she could not sleep in Savannah's room. Mia and Lugo left Savannah's bedroom, walked through her other cousins' room, and walked past her older cousin's room. Mia saw that her older cousin was still awake playing video games.

Mia testified that there were two couches in the living room, a little couch and a big couch. Once they got to the living room, Mia sat on the little couch. Mia could not recall if Lugo also sat on the little couch or first sat on the big couch and then moved to the little couch. While on the little couch, Mia testified that Lugo began touching her. Mia testified that Lugo touched her legs, her breasts (both over and under her clothes), her vagina (both over and under her clothes), and her buttocks (over her clothes) with his hands. However, Mia was uncertain as to the timing or sequence of the touching. At some point while Lugo was touching a part of her body, Mia testified the doorbell rang or there was a knock on the front door. Lugo answered the door and let his brother-in-law Tony inside. Tony came in and sat on the big couch. Lugo sat back down on the little couch. Tony offered Mia some food that he had brought and spoke to Mia and Lugo a little bit. Tony then got up and went to the guest bedroom. About five minutes elapsed from the time Tony entered the living room to the time he left, and Mia did not say anything to him about Lugo touching her. Lugo then got a blanket, moved to the big

4.

couch, and told Mia to move to the big couch. Mia complied, and Lugo then moved her hand and placed it on his penis under his clothes. Although Mia testified that Lugo touched her legs before Tony came in, that Lugo made her touch his penis after Tony left, and that he touched multiple parts of her body after Tony left, she could not specifically remember if Lugo touched her breasts or buttocks after Tony left. While Lugo was touching her, Mia testified she felt uncomfortable and pretended to be asleep.

Eventually, Lugo got up and went to his bedroom without saying anything to Mia. Mia got up and went to Savannah's room. Mia testified that she woke Savannah up and told her what Lugo had done. According to Mia, Savannah said it was "too late for this" and that Mia should not say anything because Mia did not know what "that person's going through." Savannah and Mia both went back to sleep.

The next morning, Mia testified she woke up and Savannah was gone. As she was trying to go back to sleep, Lugo came into the bedroom and apologized for what he had done the night before. Mia said it was okay because she did not want to talk about it. Mia eventually got up and spent time playing with her cousins before Lugo drove her to meet her mother.

Also during her testimony, Mia admitted that she told lies about a lot of stuff, including stealing, and that she told the lies because she did not want to get in trouble. Even though she would get in trouble for lying, Mia admitted that she would still lie.[2] Mia also testified about a time in which she complained to her mother and grandmother that her grandmother's boyfriend had made her feel uncomfortable while she was sitting on his lap during a driving lesson. Mia was told that the boyfriend was only trying to adjust himself and that nothing improper occurred, which Mia believed.

---

[2] Consistent with this testimony, Rindy and Mia's maternal grandmother both testified that Mia had some behavioral problems and was known to lie before September 18, 2021.

5.

*Tony's Testimony*

In relevant part, Tony testified he was at the birthday party on September 18, 2021, and he occasionally stayed at Angel's home. Tony was at the party until either 7:00 p.m. or 10:00 p.m., when he left with some friends. Tony returned to Angel's home between midnight and 2:00 a.m. because he was a little inebriated and he wanted to sleep. Tony testified he had his own key and used that key to enter the home. When he entered the home, he saw Mia and Lugo sitting or lying on separate couches and watching a movie. Mia was covered in a blanket and not really watching the movie. Tony originally said that Mia seemed fine, but after having his memory refreshed from a transcript of prior testimony, he said that Mia seemed annoyed because she was not allowed to sleep in Savannah's room. Tony scolded Mia for being mean to another child at the party. Mia kind of smirked and blew off what Tony said. Tony gave Mia some food that he had brought home and then went to the guestroom for the night.

*Savannah's Testimony*

In relevant part, Savannah testified she has known Mia since birth and they did not really get along. On the night of September 18, 2021, Savannah testified that Mia stayed overnight in her bedroom and she (Savannah) fell asleep first. At some point during the night, Savannah woke up to go to the bathroom and Mia was still there. Savannah went back to sleep and was later awoken by Mia. Savannah testified that Mia told her Lugo had raped her. Mia was yelling at Savannah, talking, and blaming Savannah for what had happened; Mia then just fell asleep.

## DISCUSSION

### I.    Omission of a Unanimity Instruction

#### A.    Parties' Arguments

Lugo argues in part that the trial court erred by failing to give a CALCRIM No. 3500 unanimity instruction. Lugo argues he was charged with a single count under section 288(c)(1), but Mia testified to several distinct acts of touching, and the prosecutor

did not elect to rely on any single act. Lugo argues it is possible that some jurors believed he committed one act of touching, while other jurors believed that he committed a different one. Lugo also contends the failure to give a unanimity instruction was not excused under the continuous conduct exception because there is a reasonable basis for the jury to have distinguished between different acts of touching. Specifically, Lugo argues that Tony's arrival while he was allegedly touching Mia was an intervening act that made it possible for the jurors to distinguish and disagree as to acts committed before Tony's arrival and acts committed after Tony's departure.

The People argue in part there was no error by omitting a unanimity instruction. The People argue all of the touching described by Mia was part of a single transaction and that Tony's interruption was too brief to separate the acts of touching. The People also argue that a unanimity instruction was unnecessary because Lugo made the same defense to all of the alleged acts of touching, and the jury disbelieved that defense.

## B. Additional Background

*Prosecutor's Closing Argument*

The prosecutor in part discussed the elements of a section 288(c)(1) offense. With respect to the element of touching, the prosecutor argued:

> "Now, regarding the touching, in order to be convicted of the 288(c)(1), which is a lewd or lascivious act, it's any touching. And it requires a specific intent of, it has to be for arousal or pleasure—arousal or sexual gratification.

> "And this means that any touching, even a kiss with a child on the lips, can be innocent, you know, you have your child, and you kiss them on the lips to say, you know, wake up, or … I love you.

> "But then a kiss with the child on the lips can also be for sexual gratification. So that's why there's that specific intent it has to be for sexual gratification because any touching on that child. (*Sic*.) And here you can see clearly that it was for sexual gratification.

"Touching Mia's legs. Touching Mia's breasts. Touching her buttocks, touching her vagina under her clothing. Taking her hand and placing it on his penis under his clothing.

"It's not—there's no other purpose other than for sexual gratification that he touched Mia and made Mia touch him."

*Defense Counsel's Closing Argument*

During her closing argument, defense counsel emphasized that Mia was a liar who was not credible. Defense counsel argued that some of the people who knew Mia her whole life (Savannah and her grandmother) did not believe her. Defense counsel discussed lies that Mia told (including incidents at home, at school, and with her grandmother's boyfriend) and explained that even though Mia was afraid of the consequences of her actions, she continued to lie despite getting into trouble for lying. Defense counsel argued that Mia's story did not make sense in part because it was short on details and because of all of the risks that Lugo would have had to take, given the number of people in the home. Defense counsel did not address any of the individual acts of touching that Mia described, other than to note there were few details provided and the evidence was largely in the form of answers to leading questions.

## C. Legal Standard

In criminal cases, juries must agree unanimously that the defendant is guilty of a specific crime. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 877 (*Covarrubias*).) If the evidence "establishes several acts, any one of which could constitute the crime charged, either the state must select the particular act upon which it relied [in the operative information], or the jury must be instructed that it must agree unanimously upon which act to base a verdict of guilty." (*People v. Jennings* (2010) 50 Cal.4th 616, 679 (*Jennings*); *People v. Hill* (2025) 115 Cal.App.5th 58, 68.) Unanimity instructions generally apply to acts that could have been charged as separate offenses, and, in the absence of an election by the prosecutor to rely on a specific act, must be given when jurors could disagree which act a defendant committed and yet still convict him of the

8.

crime charged. (*People v. Hoyt* (2020) 8 Cal.5th 892, 927; *People v. Beardslee* (1991) 53 Cal.3d 68, 93 (*Beardslee*).) Whether a trial court should have given a unanimity instruction is a predominately legal mixed question of law and fact which is not examined with deference. (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568.)

However, even if a unanimity instruction appears to be mandated, there are circumstances in which the instruction may be omitted. (*Jennings*, *supra*, 50 Cal.4th at p. 679; *Beardslee*, *supra*, 53 Cal.3d at p. 93.) A unanimity instruction is not required "if 'the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed the defendant committed one act but disbelieved that he committed the other [act.]' " (*Covarrubias*, *supra*, 1 Cal.5th at p. 879; see also *Jennings*, at p. 679.) Stated differently, a unanimity instruction is not required "when the defendant offers essentially the same defense to each of the acts, and there is no reasonable basis for the jury to distinguish between them." (*People v. Stankewitz* (1990) 51 Cal.3d 72, 100; see *Covarrubias*, at p. 879.) A unanimity instruction is unnecessary in such a case "because a guilty verdict indicates that the jury rejected the defendant's defense in toto." (*People v. Hernandez*, *supra*, 217 Cal.App.4th at p. 572; see *People v. Riel* (2000) 22 Cal.4th 1153, 1199 (*Riel*); *People v. Gonzalez* (1983) 141 Cal.App.3d 786, 792 (*Gonzalez*).) Additionally, if the defendant commits a series of acts that are so closely connected in time that they form part of one transaction, then a unanimity instruction need not be given. (*Jennings*, at p. 679; *People v. Maury* (2003) 30 Cal.4th 342, 423.) Courts recognize that, where the defendant's acts are substantially identical in nature, and a juror believing that one act took place would inexorably believe that all acts took place, a unanimity instruction is not required to properly guide the jury. (*People v. Champion* (1995) 9 Cal.4th 879, 932 (*Champion*); *Beardslee*, at p. 93.) In this situation, where the defendant's acts are so related, " ' "the jurors reasonably must either accept or reject the

9.

victim's testimony in toto." [Citation.]' "**3** (*People v. Jenkins* (1994) 29 Cal.App.4th 287, 299; see *People v. Bui* (2011) 192 Cal.App.4th 1002, 1011 (*Bui*).)

###### D.    Analysis[4]

We agree that any of the acts of touching described by Mia would alone be sufficient to support a conviction under section 288(c)(1), provided, of course, that the touching was made with the requisite intent. (§ 288, subds. (a), (c)(1); *People v. Shockley* (2013) 58 Cal.4th 400, 404; *People v. Martinez* (1995) 11 Cal.4th 434, 452.) However, Lugo has not demonstrated that the trial court erred by failing to give a unanimity instruction.

Mia's testimony describes multiple acts that occurred over the course of a single transaction. Mia testified to multiple acts of improper touching occurring on a single night, at the same location, and all against her by Lugo. The acts were all of a similar

---

**3**    Our Supreme Court has not been consistent in describing these situations. At one point, these situations were essentially classified as elements of one branch of the "continuous-course-of-conduct" or "continuous conduct" exception. (E.g., *People v. Crandell* (1988) 46 Cal.3d 833, 875 ["The unanimity instruction is not required when the acts alleged are so closely connected in time as to form part of one transaction. [Citations.] This branch of the 'continuous conduct' exception [citation] applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between them."]; see also *People v. Lueth* (2012) 206 Cal.App.4th 189, 196.) In *Jennings*, however, the Supreme Court identified the "continuous-course-of-conduct exception" and the "same-defense exception" as two separate exceptions. (*Jennings*, *supra*, 50 Cal.4th at pp. 679–680 ["Therefore, the course-of-conduct exception to the unanimity requirement would apply, as would the same-defense exception noted above."]; see also *People v. Selivanov* (2016) 5 Cal.App.5th 726, 752.) After *Jennings*, the Supreme Court has described when a unanimity instruction is not required by reference to general principles and without expressly naming any exception. (*Covarrubias*, *supra*, 1 Cal.5th at pp. 878–880.) Given this uncertainty, we will follow the approach of *Covarrubias* and apply established principles without deciding whether the principles are part of separate exceptions or elements of a single exception.

**4**    Lugo did not request a unanimity instruction at trial. However, this failure is of no consequence. The failure of the trial court to give a unanimity instruction may be raised on appeal irrespective of whether the defendant requested the instruction below. (*People v. Hin* (2025) 17 Cal.5th 401, 485; *Covarrubias*, *supra*, 1 Cal.5th at p. 877.)

nature in that Lugo either was touching intimate parts of Mia's body with his hands or having Mia touch an intimate part of his body with her hands. That is, Lugo engaged in sexual acts of touching or fondling with Mia. These acts of touching were only interrupted by about five minutes when Tony came back to Angel's home. Although nothing improper occurred in Tony's presence, Lugo continued to pursue the same goal of sexual gratification when he had the opportunity to do so. As soon as Tony went to his bedroom for the night, Lugo again began to engage in the same types of sexual touching with Mia that had occurred prior to Tony's arrival. Because the acts of touching were part of a single transaction, and because there is nothing that sufficiently distinguishes one act of lewd touching from another, if the jury believed one act of described lewd touching occurred, they would inexorably believe that all described lewd acts occurred. (*Champion*, *supra*, 9 Cal.4th at p. 932; *Beardslee*, *supra*, 53 Cal.3d at p. 93; *Bui*, *supra*, 192 Cal.App.4th at p. 1011; see also *Jennings*, *supra*, 50 Cal.4th at pp. 679–680.)

Lugo also offered only a single blanket defense to the charge against him—Mia was a liar whose testimony was not credible. Defense counsel did not talk about any particular act of touching in detail, did not offer separate defenses to any particular act of touching or give separate explanations for why a particular act of touching was not credible, did not treat the acts of touching as if they were somehow different or distinct in any way, and did not explain the significance of Tony's arrival in relation to his acts of touching Mia.[5] Instead, defense counsel treated the acts of touching as essentially a singular act and responded with a singular absolute defense without providing a basis for the jury to determine whether some acts of molestation occurred, while others did not. By solely making a credibility defense that Mia lies, and without addressing any particular acts or offering separate reasons for rejecting particular acts of touching,

---

[5]     In her closing, defense counsel only mentioned that Mia was in trouble because Tony told her not to be mean to other kids and that Tony's arrival meant that there were at least two people in the home who were awake at the time Mia alleged that Lugo was molesting her.

Lugo's defense did not give the jury the ability to individually assess and consider any separate acts of touching. (See *Covarrubias*, *supra*, 1 Cal.5th at pp. 879–880; *Riel*, *supra*, 22 Cal.4th at p. 1199; *Gonzalez*, *supra*, 141 Cal.App.3d at p. 792; see also *Jennings*, *supra*, 50 Cal.4th at pp. 679–680.)

Accordingly, we conclude the jury had no basis to distinguish between and disagree about the various acts of touching described by Mia. Instead, the timing and nature of Lugo's acts, as well as the nature of his sole defense, required the jury to accept or reject Lugo's defense in toto and to believe or disbelieve Mia's version of events in toto. Therefore, no unanimity instruction was required. (See *Covarrubias*, *supra*, 1 Cal.5th at pp. 879–880; *Jennings*, *supra*, 50 Cal.4th at pp. 679–680; *Riel*, *supra*, 22 Cal.4th at p. 1199; *Champion*, *supra*, 9 Cal.4th at p. 932; *Bui*, *supra*, 192 Cal.App.4th at p. 1011; *Gonzalez*, *supra*, 141 Cal.App.3d at p. 792.)

Lugo relies heavily on the arrival of Tony to argue that there is a basis for the jury to discern separate unlawful acts, specifically those acts occurring before Tony's arrival and those acts occurring after Tony's departure. We agree that Tony's arrival is noteworthy and clearly interrupted Lugo's acts of molestation. Nevertheless, we cannot agree with Lugo that Tony's interruption is as significant as he believes.

Courts have determined that when similar acts against a victim are separated by only a matter of minutes, there is generally not a sufficient break in the chain of conduct, or a sufficient basis to separate a defendant's unlawful acts, so as to mandate a unanimity instruction. (*Champion*, *supra*, 9 Cal.4th at pp. 900, 932 [two rapes committed by the same person against the same victim in the same location separated by a matter of "moments"]; *Gonzalez*, *supra*, 141 Cal.App.3d at p. 792 [two acts of penetration against the same victim by the same person at the same location and committed "within minutes" of each other]; *People v. McIntyre* (1981) 115 Cal.App.3d 899, 910–911 [two acts of oral copulation occurring within "a few minutes" against the same victim by the same person at the same location and separated by an act of rape]; cf. also *People v. Percelle* (2005)

12.

126 Cal.App.4th 164, 181–182 [two acts of attempting to use a stolen credit card to buy cigarettes made by the same person and at the same store but separated by one hour].) Instead, these cases recognize that no unanimity instruction is required because the nature of the molestation/sex act, as well as the nature of the victim's testimony, call for the complete acceptance or rejection of the victim's testimony and the defendant's defense, irrespective of small gaps in time between unlawful acts. (*Champion*, at p. 932 [jury believing one rape occurred "would inexorably believe" the other rape occurred]; *Gonzalez*, at p. 792 [recognizing that the jury could only accept or reject a consent defense in toto]; *McIntyre*, at pp. 910–911 [two acts were part of a single transaction and the jury could either fully believe victim or accept the defendant's defense that he was not present].)

Just as in these cases, the interruption from Tony's arrival was only a matter of a few minutes or moments (five minutes, specifically), and then, as soon as the interruption ended, Lugo resumed the same types of molestation as he had done before the interruption. Contrary to Lugo's suggestion, the fact that Tony's interruption involved another person and conversation with both Lugo and Mia is immaterial. In *Champion*, the defendant raped the victim, left the room for a few moments, and then returned and committed a second rape against the victim. (*Champion*, *supra*, 9 Cal.4th at pp. 900, 932.) It was unknown why the defendant left and came back (*id*. at p. 900), but whether someone called him out to talk or he simply decided to take a break, the fact remains that he stopped and left for a short period of time and then came back and committed a second rape. The interruption between acts of rape did not entitle the defendant to a unanimity instruction. (*Id*. at p. 932.) Rather, no unanimity instruction was required because "any juror believing that [the defendant] committed one of the two rapes testified to by [the victim] would inexorably believe that he also committed the other [rape.]" (*Ibid*.)

13.

The same result is applicable here. Whether the interruption was voluntary, or due to the arrival of Tony, there was still only a brief interruption and cessation of lewd acts that was followed by the immediate resumption of the same type of lewd acts. Any juror believing that Lugo molested Mia before Tony arrived would inexorably believe Mia's testimony that Lugo continued to molest her after Tony left, or vice versa. (*Champion*, *supra*, 9 Cal.4th at p. 932.) Therefore, under *Champion*, *Gonzalez*, and *McIntyre*, Tony's interruption of Lugo's unlawful acts is not a sufficient basis to require a unanimity instruction.

In sum, because a unanimity instruction was not mandated by the evidence, the trial court did not err by failing to give the jury a unanimity instruction.[6]

## DISPOSITION

The judgment is affirmed.

HARRELL, J.

WE CONCUR:

DETJEN, Acting P. J.

PEÑA, J.

---

[6] Because we conclude the trial court did not err by omitting a unanimity instruction, we do not address Lugo's argument that the omission was harmful.