Filed 5/6/13  P. v. Rincon CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E053475 |
| v. | (Super.Ct.No. SWF021729) |
| JOSE JUAN RINCON et al., | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark E. Petersen, Judge.  Affirmed.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Jose Juan Rincon.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant Dominick Haning, Jr.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

1

This case involves two defendants, Jose Juan Rincon (Rincon) and Dominick Haning, Jr. (Haning). A jury found Rincon and Haning guilty of the same crimes: (1) first degree burglary (Pen. Code, § 459);[1] (2) shooting at an occupied aircraft (Pen. Code, § 246); (3) shooting at an inhabited dwelling (Pen. Code, § 246); (4) fleeing a pursing peace officer and disregarding the safety of others while driving (Veh. Code, § 2800.2); (5) exhibiting a firearm with the intent of preventing arrest (§ 417.8); (6) driving a stolen vehicle (Veh. Code, § 10851, subd. (a)); and (7) being a felon or drug addict in possession of a firearm (Pen. Code, § 12021, subd. (a)(1)).

In regard to one count of shooting at an aircraft (§ 246), the jury found true the allegations that Rincon and Haning personally used a firearm during the commission of the offense (§ 1192.7, subd. (c)(8)). Haning admitted suffering (1) one prior strike conviction (§ 667, subds. (c) & (e)(1)); (2) one prior serious felony conviction (§ 667, subd. (a)); and (3) one prior conviction for which he served a prison term (§ 667.5, subd. (b)). The trial court sentenced Rincon to prison for a term of 13 years. The trial court sentenced Haning to prison for a term of 32 years.

Rincon raises two issues on appeal. First, Rincon asserts the evidence supporting his burglary conviction does not meet the substantial evidence standard. Second, Rincon contends the trial court erred by not staying the sentences for various convictions. (§ 654.) Haning contends the trial court erred by not staying the sentences

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

for some of his convictions because the crimes involved an indivisible course of conduct. (§ 654.) We affirm the judgments.

## FACTUAL AND PROCEDURAL HISTORY

On June 12, 2007, at approximately 7:00 p.m., Haning and Brian Guzman (Guzman) went to the Cahuilla Casino together to drink. Haning brought a gun with him. While in the casino parking lot, Haning smoked methamphetamine. When Haning finished smoking, the two men went into the casino. Haning and Guzman stayed at the casino playing at the slot machines and watching sports while Guzman drank beers.

At approximately 10:00 p.m., Haning and Guzman left the casino. Haning drove the two toward Temecula. After driving for approximately 15 minutes, Haning stopped the vehicle in a rural area, near a group of residential mailboxes. Haning exited the car and tried opening the mailboxes. At that point, Deputy Bales drove by the mailboxes. Haning reentered the vehicle. Bales made a U-turn to go back by the mailboxes. Bales made eye contact with Haning, at which point Haning started the vehicle and drove away. Bales followed Haning and Guzman. Bales gave the license plate number of Haning's vehicle to dispatch and learned the vehicle, a Dodge Durango, was stolen.

Bales turned on his patrol car's red and blue lights. Haning slowed the Durango, and then sped up "a few times." Haning told Guzman he was not stopping because of prior strike convictions and not wanting to be incarcerated. Eventually, Haning stopped the vehicle. Haning gave Guzman a handgun, which he took from under or behind the seat, and instructed Guzman to shoot the deputy when he approached the vehicle's window. Guzman told Haning he could not kill the deputy. Bales exited the patrol car,

3

Haning looked at Bales, and then Haning "took off" at a high rate of speed. Bales reentered his patrol car and pursued Haning.

As the pursuit continued, Haning's and Bales's vehicles were traveling approximately 100 miles per hour. Haning asked Guzman to dial a telephone number for him. Guzman dialed the number and handed the telephone to Haning. Haning referred to the person with whom he was speaking on the telephone as Jose. Guzman heard Haning tell Jose he was in a police pursuit and gave his location on the freeway. Haning and Jose were figuring out a place to meet.

Eventually, Haning once again stopped the Durango. It appeared Haning was going to allow Guzman to leave the vehicle, because Guzman was asking to go home. At that point, backup patrol units began arriving. Bales exited his patrol vehicle. Haning saw the multiple patrol cars and "took off again," with Guzman still inside the Durango. Haning proceeded through stop signs without stopping and continued driving at approximately 100 miles per hour through a residential area. Bales followed Haning. A helicopter was also following Haning from overhead.

Haning entered Interstate 15, heading north. Haning then proceeded on Interstate 215 north toward Perris. Deputies placed a spike strip along Interstate 215 near the transition to Highway 74. The Durango ran over the spike strip. At that point, the Durango's tires began falling apart. The Durango came to stop near the intersection of Interstate 215 and Highway 74. Four to six police cars were stopped near the Durango. Haning continued talking on the telephone to Jose, telling him his location.

4

Deputy Gasparini instructed Haning to exit the vehicle with his hands up. Haning picked up a firearm. After approximately 30 seconds, Haning exited the Durango and ran toward Highway 74—away from the law enforcement officers. Haning had a gun in his hand as he ran. Sergeant Dittenhofer removed Guzman from the Durango, and Gasparini placed Guzman in handcuffs. Inside the Durango, Gasparini found a semi-automatic pistol and a Glock pistol.

As Guzman was exiting the Durango, a Volkswagen Jetta, being driven by Rincon, traveled down the left shoulder of the freeway passing the law enforcement vehicles. Haning stopped running and "jump[ed] into the passenger window of the Jetta." Rincon "drove off" in the Jetta. Deputies in patrol cars began chasing the Jetta. The Jetta that Rincon was driving was stolen.

The Jetta travelled east on Highway 74 and then turned onto Palomar Road. Deputy Adams followed the Jetta with his patrol car's siren and red and blue lights activated. The Jetta passed through stop signs without stopping. The Jetta travelled approximately 100 miles per hour along Highway 74, but slowed along Palomar where the road becomes dirt. Rincon and Haning (defendants) eventually reached the end of Palomar Road; the road dead-ends into a rocky area with hills and power lines.

At the end of the road, Rincon stopped the Jetta; defendants exited the car and ran into the hills. Defendants hid behind boulders and shot at the law enforcement helicopter hovering above them. It appeared one of the defendants had a rifle. Defendants fired approximately 10 shots at the helicopter; one round struck the helicopter's skid. After shooting at the helicopter, defendants ran to a residential area.

5

Defendants ran onto a property containing trailers and several sheds. Hector Diaz (Diaz) lived on the property with his extended family. Diaz shared a trailer with his cousin Pedro, and Pedro's wife and children. Diaz was in his bedroom when he heard gunshots. Diaz looked out the window and saw defendants shooting at a helicopter. Diaz saw defendants run toward his trailer. Defendants went toward the area where Diaz's family parked their trucks. Defendants moved from the truck area to the trailer, shot the door of the trailer two times, and entered the trailer. Defendants went into Pedro's bedroom with guns in their hands. Pedro customarily left his truck keys hanging on a wall inside his bedroom. Defendants were inside the trailer for approximately two minutes. When defendants left the trailer, Pedro seemed scared and Pedro's wife was crying.

Defendants returned to the truck area and drove away in Pedro's truck. Rincon was in the truck's driver's seat, while Haning was in the passenger seat. Rincon drove the truck down the dirt driveway. Sergeant Hoxmeier was standing outside the front gate, on a group of rocks. Hoxmeier tracked the truck with a rifle equipped with a flashlight. Haning appeared to be holding a rifle. Hoxmeier shot into the truck's cab five times. Haning was shot in both thighs, and Rincon was shot in his upper right arm. The truck "rammed through the [property's] fence" and then collided with a patrol car. Law enforcement officers removed defendants from the truck. Two handguns and a rifle were found inside the truck.

Defendants presented evidence related to their methamphetamine consumption, and an expert opinion concerning methamphetamine induced psychosis and delirium. Haning's blood reflected 457 nanograms of methamphetamine per milliliter of blood. Dr. Zorick, a psychiatrist, concluded "it would be very normal to see at the very least a psychotic state, if not a delirious state," given the level of methamphetamine in Haning's blood. Rincon's blood reflected a methamphetamine level of 162 nanograms per milliliter. Dr. Zorick concluded at 162 nanograms per milliliter "a sensitive individual could be suffering either from psychosis or a methamphetamine-induced delirium . . . ."

In rebuttal, the People presented the testimony of Maureen Black, a toxicologist. Black worked for Bio-Tox Laboratories. In Black's work, she found most people's methamphetamine tests have results in the range of 100 to 500 nanograms per milliliter, which Black described as a "recreational" level. Based upon her training, Black concluded a person would need a methamphetamine level above 1,000 nanograms per milliliter to reach a psychotic or delirious state.

Also in rebuttal, Detective Bodmer testified that the morning after the truck crash, Haning spoke to a deputy and provided his name and date of birth. Haning appeared "very sharp [and] precise with providing his name, his date of birth, [and] the city . . . he came from."

7

## DISCUSSION

A.     <u>SUBSTANTIAL EVIDENCE</u>

Rincon contends the evidence supporting his burglary conviction (§ 459) does not meet the substantial evidence standard because there was no proof that Rincon had the intent to permanently deprive Pedro of his truck keys, which is an element of larceny. We disagree.

""""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.]'" (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1322.)

A burglary is committed when a person enters a house or inhabited camper "with intent to commit grand or petit larceny or any felony." (§ 459.) Every burglary involving an inhabited house or trailer coach is first degree burglary. (§ 460.) During closing arguments, in regard to the burglary charge, the prosecutor asserted defendants entered Pedro and Diaz's trailer with the intent to commit theft, which was evinced by defendants "end[ing] up with the car keys belonging to someone else and with a truck that belonged to someone else."

8

"[I]ntent or intention is manifested by the circumstances connected with the offense." (§ 29.2, formerly § 21, subd. (a) eff. Jan. 1, 2013.) Theft is the stealing, taking, or carrying away of another person's personal property. (§ 484.) "'California courts have long held that theft by larceny requires the intent to permanently deprive the owner of possession of the property.' [Citation.] An intent to temporarily deprive the owner of possession may suffice when the defendant intends 'to take the property for so extended a period as to deprive the owner of a major portion of its value or enjoyment[.]' [Citation.] As [our Supreme Court] noted, taking a diamond ring for two weeks is one thing; taking fresh strawberries for two weeks is another. [Citation.]" (*People v. MacArthur* (2006) 142 Cal.App.4th 275, 280.)

The offense at issue in this case took place on June 12, 2007. The Jetta that Rincon was driving was reported stolen on March 15, 2007. The Durango that Haning was driving was reported stolen on May 26, 2007. It can be inferred from this evidence that defendants tend to retain the cars they have stolen, rather than simply taking them for brief joyrides and then returning them to the owners.

When defendants entered Diaz's property, they went to the area where the trucks were parked, then entered the trailer with guns, and then returned to the area where the trucks were parked. Pedro kept his truck keys in the room defendants entered and defendants were in the room for approximately two minutes before returning to the trucks and driving away in Pedro's truck. It can be inferred from this evidence that defendants did not know how to start a vehicle's engine without a key, because if they did, then they would not have had a reason to leave the truck area and enter the trailer.

9

The evidence defendants ran to the trucks and then ran inside the trailer for only two minutes reflects defendants needed a key to start the truck. Thus, a fact finder could reasonably conclude defendants entered the trailer with the intent of taking the keys for the truck. Further, as set forth *ante*, it can reasonably be concluded that defendants did not customarily return the stolen items they used with any sort of timeliness. Therefore, there is support for the finding that defendants entered the trailer with the intent to deprive Pedro of his truck keys permanently or for an extended period of time.

Rincon asserts there is insufficient evidence of an intent to permanently deprive because (1) there was no evidence the truck keys were in Pedro's bedroom when defendants entered the trailer, (2) there was no showing regarding how defendants obtained the truck keys, and (3) it was unclear whether defendants actually took the keys. Rincon further argues that the burglary evidence was insufficient because the jury failed to reach verdicts on the robbery and carjacking counts. As set forth *ante*, a burglary occurs when a person enters a home with the intent to commit a larceny. (§ 459.) There is no requirement that the larceny be completed in order to find a person guilty of burglary. Accordingly, the lack of evidence highlighted by Rincon is not persuasive because it goes to whether the larceny was completed, not whether Rincon had the intent to commit a larceny when entering the trailer. As explained *ante*, a trier of fact could reasonably conclude Rincon entered the trailer with the intent of taking keys to a truck and permanently depriving the owner of those keys.

Next, Rincon advances the argument that defendants did not enter the trailer to commit larceny, rather, they entered the trailer to "escape from the police." Rincon's

10

argument is unpersuasive because he is not presenting the evidence in the light most favorable to the judgment. When conducting a substantial evidence review this court must look at the evidence in the light most favorable to the judgment. (*People v. Hatch* (2000) 22 Cal.4th 260, 272.) As set forth *ante*, when looking at the evidence in this light, there is reasonable, credible, and solid evidence from which a trier of fact could conclude Rincon entered the trailer with the intent of permanently taking truck keys. Thus, we find Rincon's argument to be unpersuasive.

B.     SECTION 654

1.     *LAW*

"'[S]ection 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct.' [Citation.] '"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses not for more than one." [Citation.]' [Citation.]" (*People v. Lopez* (2011) 198 Cal.App.4th 698, 717.) "Under section 654, a course of conduct divisible in time, though directed to one objective, may give rise to multiple convictions and multiple punishment 'where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' [Citation.]" (*Id.* at pp. 717-718.)

11

We review the court's explicit or implicit factual resolutions concerning the application of section 654 for substantial evidence. (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.) "[W]e consider the evidence in the light most favorable to respondent and presume the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]" (*People v. Martin* (2005) 133 Cal.App.4th 776, 781.)

### 2. *RINCON*

#### a) Procedural History

At Rincon's sentencing hearing, the trial court addressed the applicability of section 654 and expressly concluded the statute did not apply. The trial court gave the following explanation for its conclusion: "It is clear from the evidence that the defendant and his co-defendant entered the home of [Diaz and Pedro] as alleged in Count 4 [burglary] with the intent to not only evade the police, but to obtain a means of escape by obtaining the keys to a vehicle and taking the car through intimidation and fear. This is a separate and distinct criminal objective from the other crimes.

"Regarding Count 8 [driving dangerously while fleeing an officer], the defendants were clearly attempting to evade officers and flee apprehension by any means possible. [¶] Regarding Count 9 [exhibiting a firearm to prevent arrest], the defendant and his co-defendant, by brandishing a firearm[] attempted to resist arrest, caused the police to retreat or refrain from further acts in arresting the defendant. And it should be noted that in many of these counts, the victims were different as well. As an example, Count 4 involved the family of [Diaz and Pedro], while Counts 8 and 9 involved the police officers and different ones at different times.

"So as a result, the Court's intention, once again, is to sentence the defendant to the total aggregate term of 13 years based upon the calculations as previously noted." The principal term in Rincon's sentence was firing at an occupied aircraft (Count 6). (§ 246.)

  b) <u>Analysis</u>

  (1) *Counts 4 and 6 through 9*

Rincon contends his sentences for burglary (Count 4), shooting at an occupied aircraft (Count 6), shooting at an occupied dwelling (Count 7), driving dangerously while fleeing an officer (Count 8), and exhibiting a firearm to prevent arrest (Count 9) "were committed during a continuous course of conduct with the single objective of escape" and therefore the trial court erred by not staying Rincon's sentences on Counts 4, 7, 8, and 9. We disagree.

We begin with Count 4—the burglary of the trailer. Count 6, is the principal count and involves shooting at the helicopter. Rincon shot at the helicopter and then ran toward Diaz's residence. Defendants jumped over Diaz's fence, and then proceeded to the area where Diaz's family's trucks were parked. After those tasks, defendants entered the trailer and completed the burglary comprising Count 4. The evidence supports a finding that the burglary was separated from the shooting at the helicopter by both physical space, in that it occurred in a different location; and temporal space, in that time to reflect elapsed between the two incidents. In other words, the shooting at the helicopter (Count 6) and the burglary (Count 4) were divisible acts because they were temporally and physically separated in such a way as to afford Rincon an

13

opportunity to reflect and renew his intent before committing the burglary. Accordingly, we conclude the trial court did not err by not applying section 654 to Count 4.

Next, we address Count 7—shooting at an occupied dwelling. The record reflects that Diaz watched defendant through a window in his bedroom. Diaz heard glass breaking around the same time defendants entered the trailer. Diaz identified the glass as a window. Given that the evidence reflects defendants could have entered the trailer via a broken window, the evidence supports a finding that shooting into the trailer was done for the purpose of scaring the residents—to make them frightened and therefore more likely to comply with commands. The shooting into the house was not simply a means of entry, rather, it was a show of force completed for the purpose of gaining compliance from the inhabitants. Accordingly, the trial court did not err by not applying section 654 to Count 7 because there was an independent purpose or intent for committing the crime.

Third, we consider defendant's argument related to Count 8—driving dangerously while fleeing an officer. Count 8 was comprised of Rincon's act of driving away from the Interstate to the dead-end at Palomar Road. Rincon's act of driving was the beginning of his involvement in these crimes. After stopping the car at the end of Palomar Road, Rincon ran into the hills and hid behind boulders before firing at the helicopter. Once again, the driving is separated from the other crimes by a physical space and temporal space. After stopping the car, Rincon had an opportunity to reflect on his actions. However, it appears Rincon renewed his intent by choosing to run into

14

the hills and find a hiding place behind a boulder.  Thus, the record supports a finding that section 654 does not apply to Count 8 because driving was an act divisible in time from the other offenses.

Fourth, we address Count 9—exhibiting a firearm to prevent arrest.  Count 9 consisted of Rincon exiting the Jetta at the end of Palomar Road, running behind the rocks, and exhibiting a firearm prior to shooting at the helicopter.  Rincon was observed by deputies running into the hills and hiding behind rocks.  While Rincon was running into the hills, Adams positioned himself behind his car door with his gun drawn.  Sergeant Brown was also present at the end of Palomar Road, watching Rincon run into the hills.  Deputies were overhead in the helicopter, also watching Rincon run into the hills and hide behind rocks.

Rincon stopped the car at the end of Palomar Road.  At that point his dangerous driving came to an end.  Rincon could have stopped his criminal activity, but he decided to continue.  Rincon ran into the hills with a firearm.  Rincon could have stopped at that point as well, but he continued on.  Rincon shot at the helicopter.  The point here is that these crimes did not take place simultaneously.  The crimes were a string of incidents that could have ended at any point, but Rincon continually chose to move forward with another crime—to a new location with a renewed purpose.  Given this evidence, the record supports a finding that section 654 does not apply to Count 9.

Rincon contends his sentence for Count 9 must be stayed because he was exhibiting the firearm (Count 9) at the same time he was shooting at the helicopter

15

(Count 6).  Therefore, Rincon asserts the criminal acts were simultaneous and indivisible.  A transcript of law enforcement audio traffic reflects the following:

"Dispatcher:  Approaching Palomar.

"Unknown:  He's turned north on Palomar.

"Dispatcher:  Northbound Palomar.

"Marlatt:  Okay, northbound Palomar.  We're gonna stick with the passenger when he bails and uh you guys deal with the driver later.

"Unknown:  139, there's two other firearms inside the vehicle.  The suspect is in possession of a handgun.

"Dispatcher:  Copy, two other firearms inside the vehicle and the suspect does have position to grab them.

"Marlatt:  Star 9-1 copy.  If we have a foot bail, we're sticking with the passenger.  And we're coming up on Palomar, coming up to Watson now, on the dirt portion now."

The audio traffic goes on to describe Rincon running into the hills and then shots being fired.  This evidence supports a conclusion that the firearms were not displayed solely at the moment shots were being fired at the helicopter.  Rather, firearms were displayed prior to Rincon shooting at the helicopter.  Accordingly, it appears the offenses were not simultaneous—exhibiting the firearm took place before the shooting.

Next, Rincon argues he shot at an inhabited dwelling (Count 7) for the purpose of burglarizing the home (Count 4), and therefore, both crimes were committed for "the sole objective" of escaping from law enforcement officers.  Rincon's argument is not

persuasive because, as set forth *ante*, the evidence supports the finding that shooting the trailer was not simply a means of entry, e.g., there was a broken window that could have possibly served as an entry point. Rather, the shooting was a show of force completed for the purpose of gaining compliance from the inhabitants.

### 3. *HANING*

#### a) Procedural History

During Haning's sentencing hearing, the trial court addressed the applicability of section 654. The trial court said, "I firmly believe that Penal Code section 654 does not apply to this case. [¶] Here the defendant did have multiple criminal objectives for each of the crimes for which he is convicted. I'm going to go through those right now. It is clear from the evidence that the defendant and his co-defendant entered the home of [Diaz and Pedro] as alleged in Count 4 with the intent to not only evade the police, but to obtain a means of escape by obtaining the keys to a vehicle and take the car through intimidation and fear. This was a separate and distinct criminal objective from the other crimes.

"Regarding Count No. 8, the defendants were clearly attempting to evade officers and to flee apprehension by any means possible. [¶] Regarding Count No. 9, the defendant and his co-defendant, by brandishing a firearm, attempted to resist arrest, caused the police to retreat or refrain from further acts in arresting the defendant. [¶] It should also be noted that in many of these counts, the victims were different as well. Count 4 involved the family of [Diaz and Pedro] while Counts 8 and 9 involved different police officers at different times and different locations." The trial court

17

designated the sentence for Count 6—shooting at an occupied aircraft—as the principal term.

### b) Analysis

#### (1) *Counts 4 and 7*

Haning contends Counts 4 and 7—burglary and shooting at the trailer—form an indivisible course of conduct with a single intent because he shot at the trailer to gain entry to it so as to escape from law enforcement. We disagree.

If "'a defendant had several independent criminal objectives, he may be punished for each crime committed in pursuit of each objective, even though the crimes shared common acts or were parts of an otherwise indivisible course of conduct. [Citation.]'" (*People v. Phong Bui* (2011) 192 Cal.App.4th 1002, 1015.)

Haning did not enter Diaz's home to hide from deputies. Haning entered the home to commit larceny. Haning had an independent intent in burglarizing the home—to find a means to start one of the vehicles on the property. When Haning shot at the door, he displayed force. Haning had been running, he could have kicked the door or knocked, but he shot at it. A window broke before defendants entered the trailer, therefore, they possibly could have entered the trailer through that broken widow, but they shot at the door. The trial court could reasonably conclude from this evidence that Haning shot at the door to instill fear in the occupants and gain their compliance. Thus, our review of the record reveals substantial evidence supports the conclusion that section 654 did not apply to Counts 4 and 7 because Haning had independent objectives at the time he committed the offenses.

18

Haning argues that he "simply" "shot at the door to gain access to the home in an attempt to steal the truck keys inside the home," which was all part of his intention to evade law enforcement. Haning's sentence supports our conclusion. If Haning's only intention was to evade law enforcement then he would have hidden inside the trailer upon gaining entry. However, Haning had a second, independent intention, which was to obtain keys to start a vehicle. Accordingly, we find Haning's argument to be unpersuasive.

(2) *Counts 6 and 9*

Haning contends Counts 6 and 9—shooting at an occupied aircraft and exhibiting a firearm—form an indivisible course of conduct with a single objective of fleeing from arrest. We disagree.

The audio traffic evidence set forth *ante*, reflects, "The suspect is in possession of a handgun." It can be inferred that "the suspect" is Haning, since he was the original target of the pursuit. Deputies then observed defendants run from the car into the hills. Defendants began firing shots after hiding behind rocks. This evidence supports a finding that the two crimes did not occur simultaneously. Rather, Haning exhibited the firearm, found a place to hide, and then renewed his objective before shooting at the helicopter. The divisibility of the crimes is supported by the record and therefore we conclude the trial court did not err.

19

## DISPOSITION

The judgments are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
                                                                    J.

We concur:

KING
             Acting P. J.

CODRINGTON
             J.