Filed 8/28/13  P. v. Lu CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>TIAN YU LU,<br><br>    Defendant and Appellant. | A135535<br><br>(Alameda County<br>Super. Ct. No. C164460) |

## I. INTRODUCTION

Alfredo Bustamante, a U.S. Postal Service Supervisor in San Francisco, was badly injured near his home in Albany, Alameda County, when hit by a pickup truck being driven by appellant, one of the postal workers Bustamante had formerly supervised.  As a consequence of that event, the Alameda County District Attorney's office charged appellant with two counts, i.e., willful and premeditated attempted murder (Pen. Code, §§ 187, subd. (a); 664, subd. (a))[1] and assault with a deadly weapon (§ 245, subd. (a)(1)).  Both counts included an allegation that appellant intended to inflict great bodily injury.  (§§ 1203.075; 12022.7, subd. (a).)  After a several-week trial, the jury found appellant not guilty of the first count, but guilty of the second.  It was unable to reach a verdict on the great bodily injury allegation.  Appellant appeals, claiming that the trial court erred in failing to give the jury a unanimity instruction as to which act of appellant constituted the assault with a deadly weapon.  We reject appellant's argument and affirm his conviction.

---

[1] All subsequent statutory references are to the Penal Code.

1

## II. FACTUAL AND PROCEDURAL BACKGROUND

Appellant was, as noted above, a former U.S. postal service worker who had worked under the supervision of Bustamante. In 2009, Bustamante terminated appellant due to the latter's failure to improve his performance after a two-week suspension. Prior to that suspension, appellant had also been suspended from his position by other supervisors because of his job performance. After his termination, appellant remained on the job for about six weeks until an arbitrator upheld that termination.

Bustamante lived at 925 Pierce Street in Albany. Appellant lived in San Francisco. In March 2010, appellant contacted a man named Eduardo Lopez who had advertised a 1993 Ford Ranger pickup truck for sale. When appellant came to see that vehicle, he did not, per the testimony of Lopez, take it for a test drive, or even check the operation of its engine. Appellant told Lopez the truck was being purchased for operation by an employee of appellant's, allegedly an African- American man according to an identification appellant showed Lopez. Appellant provided Lopez with the name of the alleged purchaser, Herbert Gilbert Edward, a person who resided in a South San Francisco residential hotel managed by appellant. However, per an "acting assistant manager" of that hotel, Edward "wasn't quite lucid" most of the time and had never been seen driving a car.

On March 28, 2010, formal ownership of the Ford pickup was transferred to Edward.

At around 6:00 a.m. on Saturday, May 1, 2010, Bustamante left his home on Pierce Street in Albany to get into his car and go to work in San Francisco. His car, a two-door 1999 black Acura, was parked on the street in front of his house, right behind a black truck. As he did so, he heard "an engine running . . . towards the end of the block" but did not pay much attention, assuming it was just a person "trying to warm up their car." Bustamante then walked around the back of his car and used his key to open its door. As he did so, his car was struck by a "light-colored truck," specifically a pick-up truck which was "going very fast" and "straight at" him. Bustamante's right arm was in the driver's side door of his car when the pickup truck hit the car, resulting in the car door

2

slamming into that arm, fracturing it three times, and causing him "really extreme pain." Bustamante was, however, able to see that the driver of the pickup truck was an "Asian male."

About two or three seconds later, Bustamante saw the truck pull back "maybe three, four feet or so, and I could hear that he was changing gears." So, with his left arm he opened the door and pulled his "arm out, and I just ran from the vehicle" towards the sidewalk and his garage, and then fell. At the same time, the pickup truck went backwards three or four feet, changed gears again, and came forward, this time hitting Bustamante's neighbor's car, a blue Nissan, which had been parked behind the Acura. The pickup truck then drove away, slowly, and apparently with a flat tire, and then turned off of Pierce Street. A neighbor then came out to help Bustamante, followed in a few minutes by the Alameda police and an ambulance.

One of the officers went looking for a vehicle matching the description of the pickup truck, and located such a vehicle, with appellant in it, in a parking lot at the Golden Gate Fields race track. The truck had a flat tire and a damaged left front fender. The officer advised his dispatch desk that he may have located the suspect vehicle. Appellant told that officer that he had gotten a flat tire on the freeway and did not need assistance; he told the same officer that, first, he was on his way to work when he got the flat tire and, later, that he was on his way to a job interview in Berkeley when that happened. He also told that officer that the damage to the front of his truck had happened "two to three weeks prior."

Meanwhile, a second officer came to the Pierce Street location and found both the damaged Acura and blue Nissan, plus tire marks on the street. That officer followed a trail of blood from the rear of the Acura which led him to Bustamante sitting on his porch suffering a badly fractured arm. An ambulance then arrived, Bustamante's arm was stabilized by a paramedic, and he was taken to Golden Gate Fields for an "in-field showup." There, Bustamante identified both the truck as the one that had hit his car when his arm was inside its door, and also identified appellant as the driver of that truck. The police then arrested appellant.

3

After his arrest, the police searched both the pickup truck and appellant's home. In the truck they found a flashlight, night-vision goggles and binoculars. The search of appellant's home produced an email with an estimate for the repair of a fender on a Ford Ranger pickup truck, a handwritten note that stated "Retaliate. Make Reprisals," and on the bottom of which was a note reading "F250," which is a model of a Ford pickup truck. A search of appellant's computer produced a Google Maps search for 925 Pierce Street and other addresses in Albany.

The victim, Bustamante, was found to have three fractures in his right arm. That arm had to remain in either a cast, sling, or a wrap for several months. His repaired arm also had metal plates in it, resulting in additional pain in cold weather.

One of the investigating officers testified regarding several of the skid marks found at the scene of the collisions on Pierce Street. He testified that two of those skid marks, i.e., numbers one and five, indicated that the pickup truck had accelerated rapidly both when going in reverse and then when going forward again, and that both of those skid marks were fresh. He also testified that he did not find any sign of brake marks at the scene. A bit further away on Pierce Street, that officer found a mark apparently by a flat tire, i.e., similar to "a dragging mark."

Appellant testified in his own defense. He stated that he had emigrated from China in 1986, began working as a USPS letter carrier in 1994, and came under Bustamante's supervision in 2008. The latter suspended him the following year for, allegedly, not following directions. After that suspension was over, appellant took photographs of Bustamante sleeping in his car; he showed those photographs to a co-worker, who apparently then showed them to Bustamante. About a month after appellant saw Bustamante with a copy of one of the photos, appellant was terminated by Bustamante because, appellant believed, of those photographs. As a result of his termination, appellant suffered what he termed "may mien" or "lost face."

According to his testimony, after his termination, and while driving to the East Bay on the Bay Bridge, appellant saw Bustamante's car going in the same direction and followed it to the latter's home in Albany. He then devised a plan to restore his "lost

4

face," i.e., to inflict damage on Bustamante's car. He denied ever planning to injure Bustamante physically, however.

Per his testimony, appellant then looked for and bought the pickup truck he later used; he also placed a bumper guard on the truck. Then, two days before May 1, 2010, appellant drove to Bustamante's Albany neighborhood to locate the latter's Acura and, using a flashlight "in the early morning hours," verified that the Acura was parked on Pierce Street. Thus, he testified, the flashlight, binoculars and night-vision glasses were already in the truck he had recently purchased, and had been for "at least two weeks" before the May 1 incident.

On May 1, 2010, appellant continued, he planned to be at Bustamante's home at 5:30 a.m. to inflict the planned damage on the latter's car, but he was delayed when San Francisco police stopped him and asked him what he was doing when he was walking to the pickup truck; thus, it was almost 6 a.m. when he arrive on Pierce Street in Albany. He momentarily "stopped" (but later denied he had "parked") to make sure "nobody was around" and then "I just speed [sic] up . . . [and] try to use my front bumper to hit the side of the car . . . ." At the last minute, however, appellant saw "somebody in front of the door [to the car]" and put on the brakes and tried to steer the truck away from the person, but "my truck hit the car" and Bustamante ended up "on my hood" briefly. Appellant then became, he said, very scared and tried to leave; he backed up the truck and then moved it forward, but didn't turn it far enough and thus hit the Nissan as he tried to leave the scene. According to appellant, he was never trying to hurt or kill Bustamante.

Appellant's counsel then presented a collision reconstruction expert, Michael Mahoney. Mahoney characterized the damage to the Acura as "sideswipe-related" rather something caused by a "head-on" or "broadside" type of collision. He also opined that, if the truck had hit the Acura while moving at 10 mile an hour without braking, the injuries to Bustamante and the damage to the Acura would have been significantly worse. He thus opined that the brakes on the truck had been applied and that it was not possible to tell from the skid marks whether they had been made by braking or acceleration. Finally,

5

he testified that he had "no idea" as to how skid mark number five had been made, and opined that it did not derive from this incident.

In rebuttal, the prosecution called its own collision reconstruction expert, Robert Snook, who opined that all the tire marks at the pertinent point on the street were "accelerations scuffs," i.e., made while the vehicle was trying to accelerate forward faster, and none were caused by braking. More specifically, he opined that skid mark numbers one and five were both "acceleration" marks or "scuffs." He also opined that the evidence from these several accelerations marks demonstrated that the driver of the vehicle that made those marks had made no effort to either ease off the accelerator or attempt to turn the vehicle. He also testified that he had found no brake marks at the scene.

From all of this evidence, Snook opined that the vehicle had first struck the Acura from its front to its rear, and then scraped it as it backed up, and then accelerated forward again striking both the Acura a second time and then "slams head-on into the Nissan Rogue." The vehicle was then reversed into the middle of the street and then "flees the scene southbound on Pierce . . . ."

During the afternoon of the fourth day of its deliberation, i.e., February 2, 2012,[2] the jury sent the court three questions; two of them concerned only the issue of the great bodily injury (GBI) alleged enhancement, while the first asked the court to confirm that the two counts charged and the GBI issue were all "separate and distinct determinations by the jury." The court, with the approval of both counsel, so confirmed to the jury 30 minutes later. A short time later, the jury advised the court that it had reached a unanimous verdict regarding the two charged counts, but could not agree regarding the GBI allegation, and stated that they probably "will not be able to reach a unanimous decision" regarding that allegation.

The trial court then recalled the jury and conducted a brief dialogue with the foreperson, who confirmed that the jury was not in agreement regarding the GBI

_____

[2] All further dates noted are in 2012.

6

allegation "as to both counts" but also confirmed "that it is in your view only necessary to do so as to one count." The foreperson also indicated that the jury was split 6-1-5 on the "unresolved issue," i.e., the GBI allegation.

After the jury had been sent back for further deliberations, counsel and the court engaged in some discussion; the prosecutor commented that the jury "may be considering the first pass and the second pass as separate acts." Defense counsel agreed, but added "we don't know for sure." The prosecutor then stated that its case had been presented "like it's all one continuous act . . . . And maybe they need some clarity on that." Defense counsel started to make a response, but then said that "I don't think we need to put this on the record."

The jury then returned and the foreperson advised the court that they needed clarification as to the third question raised earlier, i.e., when the GBI occurred. The trial court reminded the jury that it had instructed it with CALCRIM No. 3160 regarding that issue; the foreperson responded that the jury found that instruction to contain "a little bit of ambiguity." There followed an extended discussion between the trial court and the foreperson regarding the application of the GBI enhancement, after which the foreperson stated that, based on the court's explanation, "I believe we will not be able to reach a unanimous decision on that allegation."

A short time later, the jury returned its verdict. It acquitted appellant on count one, the charge of attempted murder, but convicted him on the second count, assault with a deadly weapon. It also advised the court that it could not reach a unanimous verdict on the GBI allegation as to that count.

On March 5, appellant filed a motion for a new trial, asserting that the jury was not unanimous regarding the act that constituted the assault. The following month, his counsel amended that motion, arguing that (1) the jury was apparently not unanimous regarding the act that constituted the assault and (2) the verdict was contrary to the law and the evidence. On April 17, the prosecution filed its opposition to the amended new trial motion.

On May 4, the trial court denied appellant's motion for a new trial, denied him probation, and sentenced him to the upper term of four years in state prison.

On May 23, appellant filed a timely notice of appeal.

### III. DISCUSSION

Appellant's sole argument in his briefs to us is that the trial court erred in not giving a unanimity instruction (i.e., CALCRIM No. 3500) because the jury "may not have been unanimous as to the conduct constituting assault." We reject this argument for several reasons.

First of all, appellant never requested such an instruction from the trial court. Even more significantly, his trial counsel never contended in the trial court, even in the slightest, that the charges against appellant and the evidence produced at trial showed two separate and distinct acts that might have constituted the sole charge of which appellant was found guilty, i.e., assault with a deadly weapon. Indeed, when the prosecutor raised the issue of whether the court should clarify to the jury that what was involved in the case—or at least the prosecution's theory as to what was involved—was that "it's all one continuous act . . . one single event [and] maybe they need some clarification on that," trial defense counsel was not at all disposed to discuss that issue on the record.

The same is true regarding that counsel's argument to the jury. As to the assault count, the one charge on which appellant was found guilty, his counsel stressed to the jury, and stressed only, that the issue was the "mental state" of appellant, i.e., did he know that Bustamante was going to be near his car when he hit it. At no point in his argument regarding the assault count, did defense counsel make any reference to the fact that the truck appellant was driving made two "passes" at Bustamante's Acura. Indeed, in his closing argument to the jury, that counsel noted only very briefly that, per Bustamante's testimony, appellant had "backed up" his truck, but he never alluded to any sort of "second pass" allegedly made at Bustamante or his Acura by appellant.

Clearly, the idea that there might be a defense based on the concept of two separate and distinct assaults by appellant in his pick-up truck did not arise until after the trial and his conviction. Even then, in his two motions for a new trial, appellant never

8

argued the need for a unanimity instruction, but only that the jury's guilty verdict on the assault count was inconsistent with its inability to agree regarding the GBI allegation and, therefore, its guilty verdict on the assault count may not, in fact, have been unanimous. Only in his appeal to this court has appellant argued that the trial court erred in not giving a unanimity instruction.

Second, nothing in the dialogue between the court and the jury's foreperson was the subject matter of whether there were or may have been two separate and distinct assaults by appellant on Bustamante. Rather, the dialogue quoted in appellant's briefs to us concerned, and concerned only, the issue of the GBI alleged enhancement. Thus, the jury's three written questions to the court principally concerned the GBI allegation as did its later note to the court stating that it was "unable to reach unanimous decision as to the great bodily injury clause." A few minutes later, the jury's foreperson verbally confirmed to the court that the jury was unable to reach a unanimous resolution of the GBI allegation "as to both counts"

After the foreperson indicated that, on one issue, the jury was divided 6-1-5, there ensued the extended dialogue between the court and the jury's foreperson regarding the jury's belief that the GBI instruction the court had provided (CALCRIM No. 3160) had some "ambiguity" in it, i.e., "whether GBI has to happen or can GBI happen at any point in the incident." And the ensuring statements of the court to the jury and its foreperson concerned, and concerned only, the application of the GBI allegation. After those discussions, the foreperson advised the court that he or she believed "we will not be able to reach a unanimous decision on that allegation," a conclusion verified a few minutes later when it returned its verdicts which, again, unanimously acquitted appellant on the first count, attempted murder, and convicted him of assault with a deadly weapon. At no point during the court's discussion with the foreperson did defense counsel ask for any sidebar conversations with the court (although the prosecutor did), or raise any questions about any aspect of the court's discussion with the jury about the GBI allegation.

In sum on this point, at no time before or during the jury deliberations did defense counsel argue, or even suggest, that the jury's problems in reaching its verdict may have

9

arisen because there were, or may have been, two separate and distinct "assaults" by appellant on Bustamante. More importantly, at no time was anything remotely resembling a unanimity instruction on the second count (the assault count) requested or even suggested and, when the issue of "all one continuous act" was raised by the prosecutor, defense counsel had no reply or reaction to offer for the record.

Third and probably most important, it is very clear from the record that what was involved here was, indeed, one continuous act, even though it possibly consisted of two "passes" by appellant's pickup truck at Bustamante's Acura. Put another way, it was almost exactly the same as an assailant throwing two knives at a victim, the first one hitting the victim in his arm and the second one "three or four seconds later" coming close to the victim but hitting someplace else (e.g., a blue Nissan parked close by).[3]

The law is clear that where there is one continuous course of conduct conducted by a defendant, a unanimity instruction is not required. Our Supreme Court has made this clear in several cases. Thus, in *People v. Riel* (2000) 22 Cal.4th 1153, 1199, that court held that, in a case involving two robberies, when there was (1) "no danger some jurors would find defendant committed" one robbery and not the other and (2) "[t]he parties never distinguished between the two acts," and (3) the "defense was the same as to both: defendant was asleep in the backseat of the car and did not participate in any act of robbery," there was no need to give a unanimity instruction.

In *People v. Russo* (2001) 25 Cal.4th 1124, the defendant was convicted of conspiring to murder his wife; on appeal, he argued that the trial court had erred in not instructing the jury that it had to agree on the specific overt act that supported the

---

[3] In his reply brief to us, appellant notes several times that, in his closing argument to the jury, the prosecutor argued: "It was done twice. Huge. Huge when it comes to intent. A lot of people may say 'Oh, first time, just an accident.' Okay, he just happened to be there. I'll buy that. Twice? Twice is an intent to kill." But the law is clear that such an argument does not mean that there were, in fact, two separate criminal assaults charged against appellant or that the evidence introduced showed two separate and distinct assaults. In fact, the evidence demonstrated *an* assault on Bustamante, *perhaps* performed twice a few seconds apart, but perhaps only once.

conspiracy. Our Supreme Court disagreed, stating: "The key to deciding whether to give the unanimity instruction lies in considering its purpose. The jury must agree on a 'particular crime' [citation]; it would be unacceptable if some jurors believed the defendant guilty of one crime and other jurors believed her guilty of another. But unanimity as to exactly how the crime was committed is not required. Thus, the unanimity instruction is appropriate 'when conviction on a single count could be based on two or more discrete criminal events,' but not 'where multiple theories or acts may form the basis of a guilty verdict on one discrete criminal event.' [Citation.] In deciding whether to give the instruction, the trial court must ask whether (1) there is a risk the jury may divide on two discrete crimes and not agree on any particular crime, or (2) the evidence merely presents the possibility the jury may divide, or be uncertain, as to the exact way the defendant is guilty of a single discrete crime. In the first situation, but not the second, it should give the unanimity instruction." (*Id.* at pp. 1134-1135.)

Similarly, in *People v. Maury* (2003) 30 Cal.4th 342, a medical examiner had testified that the victim's death "was caused by strangulation, a blow to the head, or a combination of both injuries." (*Id.* at p. 422.) Based on this, the appellant argued that the trial court should have given a unanimity instruction regarding "the act or acts that caused her death." (*Ibid.*) The court rejected this argument, holding: "A requirement of jury unanimity typically applies to acts that could have been charged as separate offenses. [Citations.] A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged. [Citation.] Here, the evidence did not reflect multiple independent acts, any of which could have led to [the victim's] death. . . . Thus, the two theories were based on a *continuous course of conduct*, whose acts were so closely connected in time as to form part of one transaction. [Citations.] (*Id.* at pp. 422-423, italics added; see also *People v. Sapp* (2003) 31 Cal.4th 240, 283-285 [no unanimity instruction required in case involving murder with a special circumstance allegation of financial gain, where the evidence showed, and the prosecutor "wove . . . together," the two ways the defendant achieved financial gain via the murder of the victim.].)

11

To sum up our Supreme Court's holdings on this issue, in *People v. Crandell* (1988) 46 Cal.3d 833, 875, overruled on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 365, it said: "The unanimity instruction is not required when the acts are so closely connected in time as to form part of one transaction."   (See also *People v. Jennings* (2010) 50 Cal.4th 616, 679.)

Many Court of Appeal cases have applied this principle, including a recent decision strongly relied upon by respondent Attorney General, *People v. Bui* (2011) 192 Cal.App.4th 1002 (*Bui*).[4]  In that case, the defendant was one of two men involved in an "Oakland home invasion robbery" (*id.* at p. 1008) during which he was armed with a loaded gun, which was fired four times in "[l]ess than 10 [seconds]" (*id.* at p. 1006) resulting in wounds to both the arm and abdomen of the victim, a man named Huynh. (*Ibid.*)  After being convicted by a jury of attempted murder, the defendant argued to our colleagues in Division Four that "the trial court erred in failing to require the prosecution to elect which shot it relied on for the attempted murder charge and by failing to give a unanimity instruction."  That court rejected this argument, stating:  " 'In a criminal case, a jury verdict must be unanimous.  [Citations.] . . . Additionally, the jury must agree unanimously the defendant is guilty of a *specific* crime.  [Citation.]  Therefore, cases have long held that when the evidence suggests more than one discrete crime, either the prosecution must elect among the crimes or the court must require the jury to agree on the same criminal act. [Citations.]'  [Citation.]  However, '[t]he unanimity instruction is not required when the acts are so closely connected in time as to form part of one transaction. [Citations.]  This branch of the "continuous conduct" exception [citation] applies if the defendant tenders the same defense or defenses to each act and if there is no reasonable basis for the jury to distinguish between  them. [Citations.]'  [Citations.]  This exception ' "is meant to apply not to all crimes occurring during a single transaction but only to

_____

[4] Despite respondent's strong reliance on the holding of *Bui*, that case is never discussed or even cited in either of appellant's briefs to us.  Which is even more significant in view of both (1) its factual similarity to the instant case and (2) our Supreme Court's denial of review in *Bui*.  (See 192 Cal.App.4th at p. 1017.)

those 'where the acts testified to are so closely related in time and place that the jurors reasonably must either accept or reject the victim's testimony in toto.' [Citation.]" [Citation.]' [Citation.] [¶] The evidence showed that all of the gunshots were part of one continuous course of conduct. Huynh suffered two gunshot wounds, and a shot appeared to have made a hole in the home's window. Huynh testified the three shots he heard were fired within seconds of each other. There was no evidence from which the jury could conclude defendant fired one shot but not the other. [Citation.] On this record, the shots formed one transaction, and the jury must either have accepted or rejected Huynh's testimony in toto. In the circumstances, the prosecutor was not required to elect which among the shots she relied on for the attempted murder charge, and the trial court was not required to give the jury a unanimity instruction." (*Bui, supra,* 192 Cal.App.4th at pp. 1010-1011.)

Many other published decisions hold to the same effect. Thus, in *People v. Napoles* (2002) 104 Cal.App.4th 108, 114-117, our colleagues in Division Five of this court ruled that no unanimity instruction was required in the trial of a mother and father convicted of felony child abuse for mistreatment of their child over a several-month period of time; in so ruling, the court stated: "Even when the prosecution proves more unlawful acts than were charged, no unanimity instruction is required where the acts proved constitute a continuous course of conduct. [Citation.] ' "This exception arises in two contexts. The first is when the acts are so closely connected that they form part of one and the same transaction, and thus one offense." ' " (*Id.* at p. 115.)

In *People v. Sutherland* (1993) 17 Cal.App.4th 602, a decision of this court, the defendant was convicted of several acts of forgery and, on appeal, claimed that a unanimity instruction was required because, as to the counts on which she was convicted, it was possible that the jury found her guilty either as being the forger or as being an aider and abettor. We rejected that argument, holding that "[U]nder established California law, no unanimity instruction is required to prevent a less than unanimous verdict where the evidence independently proves acts which support defendant's liability either as a

13

principal or as and aider and abettor." (*Id.* at p. 617; see also to the same general effect, *People v. Lueth* (2012) 206 Cal.App.4th 189, 195-199.)

In his briefs to us, appellant cites several cases where the appellate court found error in the failure to give the jury a unanimity instruction, but all of them are easily distinguishable. Thus, in *People v. Melhado* (1998) 60 Cal.App.4th 1529 (*Melhado*), a case strongly relied on by appellant, the defendant was convicted of making a threat to commit a crime of violence in violation of section 422. However, the evidence before the jury consisted of two separate and distinct threats made by the defendant to mechanics who had repaired the brakes on his car, but were still holding it until they were paid. One threat, in which the defendant mentioned getting and using a grenade in retaliation, occurred at 9 a.m., and another, in which the defendant both repeated his threat and showed what appeared to be a grenade, occurred at 11 a.m. the same day. The appellate court reversed the defendant's conviction because, it held, the evidence "established that appellant committed two acts of making terrorist threats, each of which could have been charged as a separate offense, yet the matter went to the jury on only one such offense. Because the prosecution's election was never clearly communicated to the jury, the trial court should have instructed on unanimity. To hold otherwise would leave open the door to allowing a prosecutor's artful argument to replace careful instruction." (*Melhado, supra,* 60 Cal.App.4th at p. 1539.)

Appellant argues that this holding applies here, stating: "Here, there were two acts of assault alleged by the prosecutor, which could have been charged as separate offenses. The first occurred during the first pass, resulting in injury to Mr. Bustamante. The second occurred during the second pass, which missed Mr. Bustamante and resulted in no injury to him. Thus, a unanimity instruction was required . . . . [under the holding of *Melhado.*]"

We disagree. In the first place, the prosecution never "alleged" two separate and distinct acts of assault against appellant and we doubt that it properly could have bearing in mind (1) the extremely short time between the two "passes" and (2) the obviously open question of whether the second "pass" by the pickup truck was aiming for Bustamante

14

and/or his Acura or was an unintended sideswipe of the Nissan. Further, as noted above (see fn. 3, *ante*), the prosecutor's closing argument that "[i]t was done twice" does not mean that, under the law, the prosecution either was or should have been charging two separate and distinct criminal assaults against appellant.[5]

Finally on this point, the argument that a unanimity instruction "was required" under the facts of this case means that when a defendant makes two assaults on a victim within two or three seconds, the first of which hits and breaks the victim's arm and the second of which damages neighboring property, he must be charged with two separate and distinct crimes of assault with a deadly weapon under section 245, subdivision (a)(1). Such is totally contrary to the law, as *Bui* and the other authority discussed above make clear.

The only other decisions appellant specifically relies upon in support of his argument that a unanimity instruction was required here are *People v. Davis* (2005) 36 Cal.4th 510 (*Davis*) and *People v. Melendez* (1990) 224 Cal.App.3d 1420 (*Melendez*), overruled on another point in *People v. Majors* (1998) 18 Cal.4th 385, 408. *Davis* involved an appeal from two first degree murder and two robbery convictions of the defendant; the murders and robberies occurred over a three-hour period in Westwood, Los Angeles County. One of the robberies was the taking of two rings off the fingers of one of the murder victims and the other was the taking of a car from her and the other murder victim. (*Davis, supra,* 36 Cal.4th at pp. 519 & 561.) In reversing the first-noted conviction the court explained: "On the facts here, we conclude that the defendant was entitled to a unanimity instruction. The evidence disclosed two distinct takings: the taking of Harris's car from Boyd and Harris, and the taking of Boyd's rings from her person. Moreover, the prosecutor argued that the jury could rely on either theory to convict defendant of the robbery of Boyd." (*Davis, supra,* 36 Cal.4th at p. 561.) The court rejected this argument, stating: "We are not persuaded. In each of the cases the

_____

[5] As also noted above, defense counsel declined to respond to the prosecutor's suggestion during the jury's deliberations that perhaps it needed a clarifying instruction on the prosecution's continuous conduct theory.

Attorney General relies on, we concluded that a unanimity instruction was not required (or, even if required, we found no prejudice) either because the defendant offered the same defense to both acts constituting the charged crime, so no juror could have believed defendant committed one act but disbelieved that he committed the other, or because 'there was no evidence . . . from which the jury could have found defendant was guilty of' the crime based on one act but not the other. [Citation.] The same cannot be said here. As explained above, the potential defenses to the two acts of robbery were entirely different: as to the car, the defense was that Boyd was not legally in possession of it; as to the rings, the defense was that its taking constituted only the lesser included crime of theft." (*Id.* at p. 562.)

In *Melendez*, the defendant and another man were convicted of second degree robbery of a Radio Shack store in Bakersfield, a robbery apparently undertaken by both of them and one other person. The appellate court reversed the defendant's conviction because of the failure to give a unanimity instruction in view of the several goings and comings from the store that was robbed. It stated: "Respondent's assessment that this case falls into the 'single course of conduct' exception misses the mark. Robbery is not one of those crimes that involves continuous conduct resulting in one specific offense; a robbery involving a single taking is not an ongoing crime. Although the acts here surrounding and encompassing the robbery were closely related in time and place, many of the acts were testified to by different witnesses and occurred at distinguishable places and times, such that a juror might believe that defendant committed one or more of the acts and also believe that defendant did not participate in one or more of the other acts. Thus, it cannot be said there was no reasonable likelihood of juror disagreement as to the particular acts. The prosecution's evidence here was not such that the jury could have reasonably only believed or rejected it in toto. . . . [¶] In the instant case, the jurors could reasonably have disagreed as to when defendant was involved and how he was involved in the robbery." (*Melendez, supra,* 224 Cal.App.3d at pp. 1430-1431.)

We have no difficulty in concluding that, like *Melhado,* neither of these cases is applicable much less controlling here. For all of these reasons, we reject appellant's

16

argument that the trial court erred in failing to give a unanimity instruction regarding the assault charge on which appellant was convicted.

## IV. DISPOSITION

The judgment is affirmed.

_____
Haerle, J.

I concur:

_____
Richman, J.

Concurring opinion of Kline, P.J.

Defense counsel failed to request a unanimity instruction, thereby waiving that issue, because appellant never asked the jury to find he committed two separate acts with separate defenses. As trial counsel told jurors, "[t]he defense is the mental state. Did Mr. Lu know that Mr. Bustamante was going to be there and planned all of this to assault him, to assault Mr. Bustamante, or has the prosecution failed to prove that beyond a reasonable doubt."

The argument appellant makes on this appeal, that he committed two separate acts—which is unsupported by the testimony of his own accident reconstruction expert or any other credible evidence—is wholly inconsistent with his position at trial.

Neither *People v. Melhado* (1998) 60 Cal.App.4th 1529, which appellant relies upon, nor any other case imposes on a trial judge a sua sponte duty to give a unanimity instruction in these circumstances.

For the foregoing reasons, I concur in the judgment.


_____
Kline, P.J.

1